[No. B191613. Second Dist., Div. One. July 31, 2007.]

In re the Marriage of SABINE and TOSHIO M.
SABINE M., Respondent, v.
TOSHIO M., Appellant.

1204

## Counsel

Rehm & Rogari and Joanna Rehm for Appellant.

Barbakow & Ribet and Claudia Ribet for Respondent.

## Opinion

**MALLANO, Acting P. J.**—In this postdissolution proceeding, the California Child Support Services Department (CSSD) filed a motion to determine whether the husband owed arrearages on spousal and child support under a September 1995 judgment of dissolution, and, if so, the amount due. The husband argued that all issues as to arrearages had been resolved by way of a May 2003 agreement between the parties. The wife asserted that there was no enforceable agreement. The trial court found in favor of the wife.

After the judgment of dissolution, the husband did not make any support payments for nearly eight years. In May 2003, he offered to pay less than one-third of the arrearages then due in exchange for (1) a release as to the remaining arrearages and (2) a waiver of all future child and spousal support, with the exception of an unspecified amount of child support warranted by the child's or the wife's financial situation. The husband offered to pay about $100,000 of the more than $300,000 in arrearages.

The principal question on appeal is whether the parties could lawfully forgive arrearages—overdue support—where the husband agreed to pay only a portion of what he owed. We conclude that such an agreement is unenforceable where it does not resolve any bona fide disputes between the parties and is offered on a take-it-or-leave-it basis. We also conclude that the agreement did not waive future support. We therefore affirm.

## I

### BACKGROUND

The following facts are taken from the evidence submitted in connection with the CSSD's motion.

Toshio and Sabine M., both Japanese citizens, were married in the United States in April 1986. They had a daughter, E., in October 1988. In April 1993, Sabine filed a petition in the trial court to dissolve the marriage. Toshio moved back to Japan one month later.

Trial in the matter was set for July 18, 1995. Toshio was not present or represented at trial. On September 1, 1995, the trial court entered a judgment dissolving the marriage. On September 28, 1995, the trial court issued a "Further Judgment on Reserved Issues" (Judgment), setting child support at $1,750 a month and spousal support at $1,000 a month. Toshio was also ordered to maintain a policy of health insurance on E. and pay one-half of her unreimbursed medical expenses or, alternatively, to pay all of E.'s medical expenses. The Judgment recited that, pursuant to the trial court's prior "Temporary Order," Toshio owed a total of $40,418 in arrearages on child support, spousal support, and E.'s medical insurance and related expenses.

As of 1997, Sabine had not received any payments from Toshio. She asked the CSSD to pursue the matter but was told that the department could not do anything because Toshio lived in Japan. Toshio did not make any payments for the next several years.

In 2002, Sabine attempted to get paid by hiring a collection agency in Japan. In May 2003, Toshio offered Sabine approximately $100,000 and sent her a proposed settlement agreement written in Japanese (Agreement). E. was 14 years old at the time. According to a translation filed by Sabine, the Agreement stated:

"1 (Recognition of claim liability)

"In order to resolve all existing legal matters between [Sabine] and [Toshio], [Toshio] recognizes liability to pay to [Sabine] a settlement sum of Yen [10] million, whereas [Sabine] agrees to hereafter abandon all and every legal claim[] against [Toshio].

"2 (Method of payment)

"[Toshio] disburses the settlement sum of Yen [10] million within one month after signing the settlement agreement to a bank account designated by [Sabine]. The bank account will be designated by [Sabine] at the end of this settlement agreement. [¶] . . .

"3 (Child support for [E.])

"In respect to monies needed to support [E.], [Sabine] and [Toshio] agree that according to the terms of this settlement agreement, [Toshio] incurs no liability and [Sabine] makes no claims.

"However, in view of the fact that [E.] is his own child, [Toshio] affirms his intention to grant her financial assistance depending on her or [Sabine's] financial circumstances.

"4 (Liquidation clause)

"[Sabine] and [Toshio] agree that all [judgments] and orders of the Superior Court of Los Angeles are made null and void by the terms of the settlement agreement and that according to said agreement [Toshio] incurs no liabilities and [Sabine] makes no claims.

"5 (Application and jurisdiction)

"The settlement agreement between [Sabine] and [Toshio] is recognized as entirely in accordance with Japanese law and that the Tokyo District Court has exclusive jurisdiction.

"6 (Signature clause)

"In order to certify the validity of the settlement agreement, the document will be drawn up in duplicate and signed or a seal affixed, but [Sabine] will attach a certificate by the Japanese Embassy or consulate in the USA verifying her signature, whereas [Toshio] will verify the settlement agreement with a certificate of seal registry."

When Sabine received the settlement offer, she "was desperate and under duress." Two years earlier, E. had been abducted by a pedophile and was later rescued by the Federal Bureau of Investigation. After the rescue, E. was detained at the Sacramento Child Psychiatric Ward and placed on a suicide watch. Eventually, E. testified before a grand jury in Sacramento. The pedophile was charged with several counts, most of them related to child pornography, and pleaded guilty.

E. had severe emotional and physical problems. She had seen several therapists and weighed about 320 pounds. Although the Department of Children and Family Services recommended that E. continue to receive therapy two or three times a week, Sabine could not afford it. As Sabine put it, we were "out of money; [Toshio] had not paid me in 8 years. I accepted the [settlement] offer on the sole basis and requirement that the funds would be in my hands within the 30-day period stipulated in the document." (Boldface omitted.)

Sabine signed the Agreement and had it notarized. On May 15, 2003, she gave the executed Agreement to an "intermediary" at the collection agency, together with written information describing how to wire the money to her from Suruga Bank in Japan. Toshio contends he did not receive the wire instructions; instead, the intermediary insisted that the money be given directly to him in accordance with a note signed by Sabine. Toshio refused that demand because the Agreement required that the funds be wired to Sabine, and he did not trust the intermediary.

As the end of the 30-day period approached, Sabine spoke by telephone with Toshio's attorney in Japan, Takahiro Yuyama, and asked when the money would arrive. Yuyama said he was having "problems." In particular, Toshio's relatives were funding the settlement, and they were "balking" because the release did not include a $250,000 claim against Toshio by Sabine's *mother*. Sabine replied that she could not and would not agree to a release on her mother's behalf and that the settlement was "now null and void." For his part, Yuyama disputes the substance of this conversation.

Sabine did not receive any money from Toshio during the 30-day period. It would take another year and a half before she would receive any money from him.

In June 2004, Sabine retained an attorney in Japan, Mikiko Otani, to pursue the recovery of arrearages. On September 28, 2004, Otani met with Yuyama in family court in Japan. According to Otani, Yuyama said the parties had attempted to settle the matter in May 2003, but the agreement was canceled, or "floated away," and had been "forfeited." Yuyama handed Otani a new settlement agreement, proposing that Toshio pay 10 to 12 million yen in exchange for a release of all claims by Sabine *and her mother*. Otani contacted Sabine that day, and Sabine immediately rejected the offer. Otani relayed that response to Yuyama while they were still at the courthouse. Yuyama denies making these statements but admits drafting the revised settlement agreement. He states that the terms of the new proposal came from Sabine's collection agency.

Otani claims that, on October 28, 2004, Yuyama contacted her, saying Toshio wanted to send Sabine 10 million yen (about $100,000) in an "uncharacterized" lump-sum payment and to pay 100,000 yen ($1,000) a month in child support. Otani said she would talk to Sabine but expressed

concern that Sabine's receipt of the money might be considered an acceptance of the Agreement. Yuyama replied that Sabine should view the money as a "deposit" and that its acceptance would not be to Sabine's "disadvantage." Again, Yuyama denies making these statements.

Arrangements were made to wire the money to Sabine's attorneys in California. On December 17, 2004, Yuyama told Otani that Toshio intended to write "settlement money" on the wire transfer form. Otani said Sabine was accepting the funds on the condition that the purpose would be unspecified. By facsimile to Yuyama of the same date, Otani confirmed their conversation, stating that Sabine's receipt of the money would not constitute, or be evidence of, a settlement of the Judgment. Three days later, Otani sent Yuyama a certified letter to the same effect.

On December 22, 2004, Toshio wired 10 million yen (about $100,000) to the bank account of Sabine's California counsel. The wire transfer documents contain writing in English and Japanese. Under the space for indicating the "Purpose of Remittance" and "Message to Beneficiary," someone wrote in English, "Case # 108622." That is the number of this family law case. The term "settlement money" or similar words do not appear anywhere in English. And the record does not indicate that those words appear in Japanese.

From December 2004 until June 2005, Toshio wired $1,000 a month in child support to the same bank account.

Meanwhile, Sabine was able to enlist the assistance of the CSSD in attempting to collect arrearages, apparently because Toshio, although living in Japan, was working for a subsidiary of a California company. The CSSD determined that Toshio's arrearages, plus interest, as of September 2005 consisted of $246,692 in child support, $97,441 in spousal support, and E.'s medical expenses of $14,066, for a total of $358,199. Sabine asserts that the CSSD's calculations contained some errors: (1) E.'s medical expenses were actually $99,265; and (2) the child and spousal support numbers were each $995 too low. Using Sabine's figures, Toshio owed approximately $445,388 in arrearages.

On September 2, 2005, Sabine renewed the judgment. A notice to Toshio stated, "This renewal extends the period of enforceability of the judgment until 10 years from the date of the application for renewal was filed." (See Fam. Code, §§ 4502, 291, subd. (b); former § 4502, subds. (a), (b); all section references are to the Family Code unless otherwise indicated.)

On October 31, 2005, the CSSD filed a motion in the trial court, requesting the court to decide whether the parties had settled the arrearages matter in May 2003 and, if not, to determine the amount of arrearages. (See § 17400 et seq. [local child support agency shall enforce support obligations].) The motion was addressed to the parties and requested that they submit evidence to the court on those issues.

In support of her position, Sabine filed a declaration of her own, one by Otani, and exhibits. For his part, Toshio filed his own declaration, two by Yuyama, and exhibits. Toshio and Yuyama stated that the settlement money was not wired to Sabine within 30 days of the Agreement because she did not provide the requisite wire instructions until December 2004, at which time the funds were promptly sent to her attorneys. Yuyama denied making any statements to Sabine or Otani in which he questioned the validity of the Agreement or referred to problems in getting the money. Toshio and Yuyama asserted they had consistently maintained that the Agreement was valid and enforceable.

In her memorandum of points and authorities, Sabine argued that (1) the Agreement was not enforceable, primarily because she did not receive the funds within 30 days, and (2) a waiver of arrearages is void as against public policy. In his papers, Toshio contended that the parties had entered into a valid, enforceable agreement; he owed nothing for the period preceding the filing of the CSSD's motion; and, thereafter, he was responsible only for child support in accordance with the Agreement.

At the hearing on the motion, the trial court stated on the record that the Agreement was too vague, ambiguous, and unclear to constitute a release of arrearages. In a subsequent written order, dated April 3, 2006, the court recited that "[t]here was no enforceable settlement agreement concerning arrears under [the Judgment]" and "[t]he CSSD shall perform an audit, and calculate arrears owed by [Toshio] to [Sabine] under the . . . Judgment from September 22, 1995, to the present." There was no statement of decision. None was requested. Toshio appeals from the order.

## II

## DISCUSSION

As a preliminary matter, the Agreement seems to require that its validity and effect be determined under Japanese law. The parties have cited only California authority. We therefore apply state law. (See *Nedlloyd Lines B. V. v. Superior Court* (1992) 3 Cal.4th 459, 469, fn. 7 [11 Cal.Rptr.2d 330, 834 P.2d 1148].)

For purposes of our analysis, we first determine whether the parties could lawfully forgive payments that accrued before the Agreement was executed in May 2003. We then address whether, after its execution, the Agreement effectively modified or terminated future support and medical expense payments. We answer both questions in the negative.

## A. *Release of Arrearages*

When Sabine signed the Agreement in May 2003, the arrearages, not including interest, totaled about $365,863—$40,418 in arrearages as set forth in the Judgment, $253,000 in child and spousal support incurred after the Judgment, and $72,445 for E.'s medical expenses as calculated by Sabine. Toshio offered $100,000 in exchange for, among other things, a release as to the remaining amount owed ($265,863). Toshio contends that the parties could lawfully contract to forgive the past due payments. But the law is to the contrary.

Because the pertinent evidence on this issue is not in dispute, we review the trial court's order de novo. (See *ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266–1267 [35 Cal.Rptr.3d 343]; *Fittante v. Palm Springs Motors, Inc.* (2003) 105 Cal.App.4th 708, 713 [129 Cal.Rptr.2d 659].) "We are not bound by the trial court's stated reasons for its ruling . . . as we only review the ruling and not its rationale." (*Rinehart v. Boys & Girls Club of Chula Vista* (2005) 133 Cal.App.4th 419, 429 [34 Cal.Rptr.3d 677].)

 As applicable here, section 3651, subdivision (c)(1) (section 3651(c)(1)), states: "[A] support order may not be modified or terminated as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate." This statute "applies whether or not the support order is based upon an agreement between the parties." (§ 3651, subd. (e).) "Accrued" means "past due." (See *Taylor v. Superior Court* (1990) 218 Cal.App.3d 1185, 1188 [267 Cal.Rptr. 519].)

Section 3651(c)(1) (former subdivision (b)) became effective in 1994. (See Stats. 1992, ch. 162, §§ 10, 13, pp. 464, 567–568, 722.) It replaced Civil Code section 4811, subdivisions (a) and (b), enacted in 1969. (See Stats. 1969, ch. 1608, § 8, pp. 3314, 3336; Cal. Law Revision Com. com., 29E West's Ann. Fam. Code (2004 ed.) foll. § 3651, p. 507.)

As originally enacted, Civil Code section 4811 provided: "(a) . . . All . . . orders for *child support,* even when there has been *an agreement between the parties* on the subject of child support[,] . . . may be *modified or revoked* at any time at the discretion of the court, *except* as to any amount that *may have accrued* prior to the date of filing of the notice of motion or order to show cause to modify or revoke. [¶] (b) . . . The provisions of *any agreement or order for the support of either party* shall be subject to subsequent *modification or revocation* by court order *except* as to any amount that *may have accrued* prior to the date of filing of the notice of motion or order to show cause to modify or revoke . . . ." (Stats. 1969, ch. 1608, § 8, pp. 3314, 3336, italics added.) Although this language differs somewhat from that of section 3651(c)(1), no substantive change was intended. (See Cal. Law Revision Com. com., 29E West's Ann. Fam. Code, *supra,* foll. § 3651, at p. 507.)

■ Several Courts of Appeal have held that section 3651(c)(1) precludes a trial court from modifying or forgiving accrued support payments—arrearages. (See *County of Santa Clara v. Wilson* (2003) 111 Cal.App.4th 1324, 1327 [4 Cal.Rptr.3d 653] ["retroactive modification of accrued child support arrearages is statutorily barred"]; *In re Marriage of Cordero* (2002) 95 Cal.App.4th 653, 667–668 [115 Cal.Rptr.2d 787] & fn. 21 [trial courts lack authority to waive or forgive interest on past due child and spousal support for same reason courts cannot retroactively modify or terminate arrearages themselves]; *In re Marriage of Perez* (1995) 35 Cal.App.4th 77, 80 [41 Cal.Rptr.2d 377] [trial court exceeded its jurisdiction in reducing child support arrearages from $5,000 to $2,000].) One Court of Appeal has concluded that, just as a trial court cannot modify or forgive arrearages, the parties cannot waive arrearages by agreement or other conduct. (See *In re Marriage of Hamer* (2000) 81 Cal.App.4th 712, 718–722 [97 Cal.Rptr.2d 195].)

As our Supreme Court made clear long before any state statute addressed the subject: "[A] decree for alimony may be modified as to installments to become due *in the future.* As to *accrued* installments it is final. [Citations.]

"A subsequent order which relieves the husband from paying *accrued* alimony . . . , and discharges said alimony by offsetting it against an indebtedness of the wife to the husband existing at the time of entry of the divorce decree is a modification as to past due installments, . . . as is an order requiring the wife to accept in full settlement of accrued alimony less than the full amount due.

". . . To hold that alimony decrees may be modified retroactively in the manner contended for herein would be contrary to the rule of finality as to past due installments . . . ." (*Keck v. Keck* (1933) 219 Cal. 316, 320–321 [26 P.2d 300], italics added.)

■ More recently, another court has explained: "[T]he current state of the law is that a judgment for child or spousal support, once entered, is per se enforceable *until paid in full*, and is not retroactively modifiable either as to accrued arrearages or any interest due thereon." (*In re Marriage of Hamer, supra*, 81 Cal.App.4th at p. 722.) And according to a leading treatise: "The [trial] court, in its discretion, may craft a schedule or plan for payment of support arrearages, but it has *no* discretion to waive or forgive any part of a support arrearages debt. Support orders are not retroactively modifiable as to accrued arrearages. . . . [¶] This rule also applies to *accrued interest* on unpaid support arrearages. . . . [A]ny forgiveness of accrued interest would . . . be an impermissible retroactive modification." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2007) ¶ 18:13, pp. 18-6 to 18-7.)

■ "[T]he Family Code does not expressly address whether a *waiver* defense (voluntary relinquishment of [a] known right) may ever be cognizable in an action to collect unpaid child support. No known reported authority under current law, however, has recognized such a waiver defense *based on conduct* (i.e., implied or inferred waiver). And, conceptually, it seems difficult to reconcile an implied waiver rule with the statutes making support orders enforceable until paid in full (Fam.C. §§291(a), 17400(e)) and barring retroactive modification of arrearages and interest thereon (Fam.C. §3651(c))." (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 6:739.10, pp. 6-293 to 6-294.) The same is true for spousal support arrearages. (See *id.*, ¶ 6:1126, p. 6-412.8.)[1]

That is not to say a trial court lacks authority to determine whether any arrearages exist and, if so, the amount due. (See *In re Marriage of Robinson* (1998) 65 Cal.App.4th 93, 98 [76 Cal.Rptr.2d 134].) Nor are the parties precluded from settling all disputes that might affect the calculation of arrearages. "When a dispute, having the ring of truthfulness on each side, arises, concerning an amount due under an obligation, as in a case where . . . an agreement is . . . made to accept a lesser sum in full satisfaction of the

---

[1] In determining the amount of arrearages to be collected, a trial court may consider certain equitable factors, including: (1) whether the child lived with the indebted parent instead of the parent awarded physical custody; (2) any overpayments of support; (3) the indebted parent's financial situation for purposes of developing a payment schedule; and (4) any arrearages owed by the *custodial* parent under another support order. (See 2 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 2006) § 42.03, pp. 42-6.1 to 42-6.2; *Keith G. v. Suzanne H.* (1998) 62 Cal.App.4th 853, 858–861 [72 Cal.Rptr.2d 525].)

amount [in controversy], the obligation is cancelled by a tender and acceptance of the lesser sum in full payment." (*Robertson v. Robertson* (1939) 34 Cal.App.2d 113, 117 [93 P.2d 175].) Thus, where a husband asserted that he owed $250 a month in spousal support, and the wife contended that $300 was the correct amount, they could resolve their differences in a manner that was binding on the court. (*Id.* at pp. 117–118.)

**(5)** But an accord and satisfaction requires the existence of a bona fide dispute concerning the debt. (See *In re Marriage of Thompson* (1996) 41 Cal.App.4th 1049, 1058 [48 Cal.Rptr.2d 882].) Here, there was none. Toshio did not deny the existence of the arrearages, question the meaning of the Judgment, or raise any issue concerning the amount he owed. Nor did he contend that the Judgment was invalid or void as a result of extrinsic fraud, lack of service of process, or any other reason. Quite simply, Toshio offered Sabine less than one-third of the arrearages in exchange for a release as to the rest. We fail to see how this resolved a bona fide dispute. "[A]n agreement for payment of a part of the amount due is without consideration." (*Occidental Life Ins. Co. v. McCracken* (1937) 19 Cal.App.2d 239, 241 [65 P.2d 130]; accord, *Grant v. Aerodraulics Co.* (1949) 91 Cal.App.2d 68, 75 [204 P.2d 683].) Put another way, a "legal obligation to perform an act may not constitute consideration for a contract." (*O'Byrne v. Santa Monica-UCLA Medical Center* (2001) 94 Cal.App.4th 797, 808 [114 Cal.Rptr.2d 575]; accord, *Alhino v. Starr* (1980) 112 Cal.App.3d 158, 168 [169 Cal.Rptr. 136]; *Watkins v. Clemmer* (1933) 129 Cal.App. 567, 577–578 [19 P.2d 303]; see generally 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 218, pp. 251–252.) "Performance of a legal duty to a promisor which is neither doubtful nor the subject of honest dispute is not consideration . . . ." (Rest.2d Contracts, § 73, p. 179; see Civ. Code, § 1605 [no contract is formed where promisor receives that to which she is lawfully entitled or where promisee consents to provide what he is lawfully bound to provide].)

Toshio's principal authorities—*Hunter v. Hunter* (1959) 170 Cal.App.2d 576 [339 P.2d 247] (*Hunter*), *Graham v. Graham* (1959) 174 Cal.App.2d 678 [345 P.2d 316] (*Graham*), and *In re Marriage of Paboojian* (1987) 189 Cal.App.3d 1434 [235 Cal.Rptr. 65] (*Paboojian*)—and the cases applying them—*Kaminski v. Kaminski* (1970) 8 Cal.App.3d 563 [87 Cal.Rptr. 453] and *Potts v. Superior Court* (1964) 229 Cal.App.2d 692 [40 Cal.Rptr. 521]—are not to the contrary. They did not involve arrearages—*accrued* payments—but agreements between the parties to modify or terminate support *prospectively*. In those cases, the parties had agreed to a waiver or partial waiver of *future* support, and the custodial parent later sued for alleged *postagreement* arrearages. Because the paying parent had honored the agreement, no arrearages

existed. For instance, in *Hunter*, the court held that there were no accrued payments because the parties had expressly agreed in writing to reduce the amount of future support. (See *Hunter*, at pp. 578–579, 582–583.) A similar understanding had been reached by way of an oral agreement in *Graham*. (See *Graham*, at pp. 682–684.) And in *Paboojian*, the father told the wife he could not afford to pay both child support and spousal support, and the wife responded, " 'Take care of the children and forget the alimony.' " (*Paboojian*, at p. 1437.)

In short, "a person has the ability to *prospectively* waive court-ordered support." (*Paboojian, supra*, 189 Cal.App.3d at p. 1438, italics added; see *Colby v. Colby* (1954) 127 Cal.App.2d 602 [274 P.2d 417] [where mother agreed to forgo monthly child support in exchange for one lump-sum payment, father was relieved of obligation to make further monthly payments]; see also *In re Marriage of Armato* (2001) 88 Cal.App.4th 1030 [106 Cal.Rptr.2d 395] [written settlement agreement modifying future child support may be enforced in dissolution action through summary procedure established by Code Civ. Proc., § 664.6].)[2]

Nor can Toshio take comfort in cases holding that, by concealing the whereabouts of a child, the custodial parent waives the right to collect child support for the period of concealment. (See, e.g., *In re Marriage of Damico* (1994) 7 Cal.4th 673, 685 [29 Cal.Rptr.2d 787, 872 P.2d 126]; *State of Washington ex rel. Burton v. Leyser* (1987) 196 Cal.App.3d 451, 458–460 [241 Cal.Rptr. 812] (*Leyser*).) The act of concealment operates as a waiver of child support *prospectively* and only until the noncustodial parent locates the child. (See *In re Marriage of Damico*, at pp. 683–685.) Support does not accrue *during* the period of concealment because the custodial parent has expressed a desire to raise the child without financial assistance from the noncustodial parent. (See *id.* at p. 680; *Leyser*, at pp. 456, 459.) And if the concealment ends before the child reaches the age of majority, it does not constitute a waiver because the child might benefit from payment of the *entire* overdue amount. (See *In re Marriage of Comer* (1996) 14 Cal.4th 504, 515–518 [59 Cal.Rptr.2d 155, 927 P.2d 265]; *In re Marriage of Vroenen* (2001) 94 Cal.App.4th 1176, 1181–1182 [114 Cal.Rptr.2d 860].)

The doctrines of waiver and estoppel have their place in support proceedings. (See *In re Marriage of Damico, supra*, 7 Cal.4th at p. 681.) But, in general, arrearages—support payments that are past due—cannot be forgiven. Courts previously recognized an exception to the general rule, applying the

---

[2] In *In re Marriage of Hamer, supra*, 81 Cal.App.4th 712, the court misread *Graham* and *Paboojian* as permitting the parties to waive *arrearages* by agreement. (See *In re Marriage of Hamer*, at pp. 718–721.) As we have pointed out, those cases involved *prospective* waivers of support.

doctrine of laches to bar the recovery of arrearages. (See *In re Marriage of Fellows* (2006) 39 Cal.4th 179, 184–185 [46 Cal.Rptr.3d 49, 138 P.3d 200] [discussing cases].) In 2002, however, the Legislature enacted section 4502, subdivision (c) (now § 291, subd. (d)), limiting the defense of laches to "any portion of the judgment *owed to the state*." (Stats. 2002, ch. 304, § 1, italics added; see Stats. 2006, ch. 86, § 4.) This statute is retroactive. (See *In re Marriage of Fellows*, at pp. 186–188.)

█ In the present case, Toshio did not make any support payments between the entry of the Judgment, in September 1995, and the execution of the Agreement, in May 2003. Yet he argues that the Agreement extinguished more than two-thirds of the support and medical expense payments that became due during that time. By way of the Agreement, he sought a retroactive reduction in nearly eight years of missed payments. In the trial court, he sought an order modifying the amount that accrued before the Agreement. The law does not countenance such a result. (See § 3651, subd. (c); *County of Santa Clara v. Wilson, supra*, 111 Cal.App.4th at pp. 1326–1327; *In re Marriage of Cordero, supra*, 95 Cal.App.4th at pp. 667, 668, fn. 21; *In re Marriage of Hamer, supra*, 81 Cal.App.4th at pp. 718, 722.) Equity does not permit it either. (See *County of Santa Clara v. Wilson, supra*, 111 Cal.App.4th at pp. 1325–1327, distinguishing *In re Marriage of Dancy* (2000) 82 Cal.App.4th 1142, 1148–1149 [98 Cal.Rptr.2d 775]; *In re Marriage of Everett* (1990) 220 Cal.App.3d 846, 854–856 [269 Cal.Rptr. 917]; Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 6:1094.1, p. 6-407.) To avoid the arrearages, Toshio could have requested that the trial court modify his support and medical expense obligations *before* the payments became due. (See *In re Marriage of Hamer, supra*, 81 Cal.App.4th at p. 723; *In re Marriage of Perez, supra*, 35 Cal.App.4th at pp. 80–81.) He made no such effort.

Under section 3651(c)(1), the trial court had no authority in these circumstances to enter "an order requiring [Sabine] to accept in full settlement of accrued [support] less than the full amount due." (*Keck v. Keck, supra*, 219 Cal. at p. 321.) Accordingly, the trial court properly concluded that Toshio was liable for the arrearages that accrued before May 2003.

### B. *Prospective Waiver of Support*

█ As stated, "a person has the ability to prospectively waive court-ordered support." (*Paboojian, supra*, 189 Cal.App.3d at p. 1438.) But a trial court need not "blindly enforce any type of . . . support agreement signed by the parties after judgment." (*In re Marriage of Armato, supra*, 88 Cal.App.4th

at p. 1045.) Given our resolution of the prospective waiver issue, as discussed below, we need not discuss whether public policy considerations might limit or invalidate the purported waiver here. (See *id.* at pp. 1045–1046.) We review the trial court's decision under the substantial evidence test. (See *In re Marriage of Jones* (1990) 222 Cal.App.3d 505, 515 [271 Cal.Rptr. 761].)

" '[T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings. . . . 'We must therefore view the evidence in the light most favorable to the prevailing party, giving [her] the benefit of every reasonable inference and resolving all conflicts in [her] favor . . . .' " (*Estate of Leslie* (1984) 37 Cal.3d 186, 201 [207 Cal.Rptr. 561, 689 P.2d 133], citations omitted.)

Toshio argues that the Agreement operated prospectively, such that after May 2003, spousal support and medical expense payments were terminated in their entirety, and child support was modified to an unspecified amount, payable at unspecified times, "depending on [E.'s] or [Sabine's] financial circumstances."

Sabine counters that she was not bound by a contract of any kind, primarily because Toshio did not pay her within the contractual 30-day period. Rather, a year and a half later, Toshio made an "uncharacterized" lump-sum payment of $100,000 and paid $1,000 a month in child support for a short length of time. Sabine contends that her interpretation of events is supported by substantial evidence.

Toshio replies that the trial court did not decide whether he satisfied a material term of the Agreement but concluded, as stated at the hearing, that the Agreement was too vague, ambiguous, and unclear to be enforceable. According to Toshio, we must reverse the trial court unless we agree with its comments at the hearing. Under this theory, we should ignore the trial court's written order, which simply states, "[t]here was no enforceable settlement agreement concerning arrears under [the Judgment]." We reject this argument.

If Toshio wanted the trial court to expressly resolve all of the factual issues raised by the motion, he should have requested a statement of decision. (See § 3654.) He does not claim he did so. Nor does Toshio assert that, after the order was issued, he brought any alleged deficiencies in the order to the trial court's attention. In fact, his attorney signed the order, approving it as to form.

Absent a statement of decision, "we will presume the trial court found every fact necessary to support its decision." (*Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180, 1185 [49 Cal.Rptr.2d 220].) "Where . . . there is a conflict in the evidence, 'we will infer findings in favor of the [order] . . . .' " (*In re Marriage of Dancy, supra,* 82 Cal.App.4th at p. 1159; see also *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1132–1138 [275 Cal.Rptr. 797, 800 P.2d 1227].) "In reviewing [an order] without a statement of decision the appellate court indulges every intendment in favor of the [order] . . . . The task of the appellate court is limited to searching the record for any substantial evidence which will support the [order]." (*In re Marriage of Jones, supra,* 222 Cal.App.3d at p. 515.)

Here, substantial evidence supports the following implied findings of the trial court. In May 2003, Sabine agreed to a prospective modification of support and medical expense payments if she received $100,000 from Toshio within 30 days. That was a material term of the Agreement because Sabine had run out of money, and E. was in need of medical treatment and therapy. Sabine provided instructions as to how the money should be wired to her. Regardless of whether Toshio received the instructions, his relatives refused to fund the settlement because it did not release a claim by Sabine's mother.

Over a year later, Toshio's attorney admitted that the May 2003 attempt to resolve the arrearages issue had failed. Toshio offered a second written agreement that released all claims by Sabine and her mother. But if Sabine's claims had been settled the year before, there was no reason to include them in the second agreement. Sabine rejected the second settlement offer. In October 2004, Toshio offered to send Sabine an "uncharacterized" payment of $100,000 and $1,000 a month in child support. Sabine was concerned that receipt of the money might be viewed as an affirmation of the Agreement. Toshio's attorney assured Sabine that the money was only a "deposit" and that receipt of the money would not be to her "disadvantage." With that understanding, Sabine accepted the wire transfer in December 2004.

In sum, Toshio did not satisfy a material term of the Agreement: He failed to pay the funds within the requisite 30 days. Consequently, the Agreement was not an enforceable modification of future support and medical expense payments. (See *Loral Corp. v. Moyes* (1985) 174 Cal.App.3d 268, 280 [219 Cal.Rptr. 836].) The trial court properly concluded that the CSSD should determine the amount of arrearages that accrued "under the . . . Judgment from September 22, 1995, to the present." As to the amount of arrearages, we express no opinion.

## III

## DISPOSITION

The order is affirmed.

Vogel, J., and Jackson, J.,[*] concurred.

A petition for a rehearing was denied August 21, 2007.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.