Filed 6/1/26  Marriage of Brinton CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re the Marriage of TODD and TRACI BRINTON. | **PUBLIC VERSION**<br>**Redacts material from sealed record** |
| TODD BRINTON,<br><br>        Respondent,<br><br>v.<br><br>TRACI BRINTON,<br><br>        Appellant. | A170623<br><br><br>(San Mateo County<br>Super. Ct. No. FAM121392) |

Traci Brinton appeals from a postjudgment order on specific issues related to the parties' marital settlement agreement (MSA) and subsequent stipulation amending the MSA.[1]  These issues included (1) whether a certain stock warrant issued to Todd was an omitted asset that must be divided; (2) whether Traci was entitled to bonus spousal support on Todd's income from the sale of certain stock; and (3) whether additional child support was owed by Todd.  Traci argues the trial court erred on each of these three issues in its decision following a bench trial.  We disagree and affirm.

---

[1] As do the parties in their briefs, we refer to the parties by first name for clarity, intending no disrespect.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Todd and Traci were married in 1996.  They now have two adult children.  Todd is an interventional cardiologist.

In 2009, Todd cofounded a medical device company called Shockwave Medical, Inc. (Shockwave), with two other individuals.  They also formed DJT, LLC (DJT), to hold intellectual property that was then licensed by Shockwave.  Todd held a 29-percent membership interest in DJT.

Todd and Traci separated in 2012.  They executed the initial MSA in 2013, which was incorporated into a judgment of dissolution.  After various disputes regarding spousal and child support owed, Todd and Traci entered a stipulation in 2017 that amended the support provisions of the MSA (Stipulation).

In 2019, Traci filed a request for order to enforce the terms of the judgment and to verify the division of property and support owed under the judgment.  Trial dates were set in 2023.  Prior to trial, the parties stipulated to resolve certain issues and identify the "only pending requests before the Court."  These pending requests included whether a certain stock warrant issued to Todd was "an undisclosed community asset that must be divided and/or subject to additional child support or spousal support"; whether spousal or child support was owed on Todd's income from the sale of certain stock; and if so, the amount of such support.

The matter proceeded to a bench trial.  The court issued its statement of decision on April 11, 2024.  It determined Traci had no claim to the stock warrant or bonus spousal support on the income from the sale of stock but Todd owed $48,004 in additional child support.

This appeal followed.[2]

## DISCUSSION

**I.** ***Trial Court Did Not Err on Stock Warrant***

A. *Additional Background*

In 2009, DJT was formed as a Delaware limited liability company to hold intellectual property invented by Todd's two cofounders. **[REDACTED]** The parties agreed Todd's portion of these shares was community property; there was no dispute presented to the trial court on this issue.

In 2015, almost two years after Todd and Traci executed their MSA, Shockwave engaged in a round of financing. In connection with this financing round, DJT entered into an agreement with Shockwave to terminate their prior license agreement and **[REDACTED]**. The agreement stated: "**[REDACTED]**" (Boldface omitted.)

Todd was issued a warrant to purchase up to 501,613 shares of Shockwave common stock. Traci's expert testified at trial that a warrant is "similar to an option" in that it "gives someone the right, but not the obligation, to acquire stock in a company at some sort of exercise price." Certificates of cancellation of DJT were filed in Delaware and California in 2017 and 2018, respectively. Shockwave went public in 2019. Todd exercised the warrant and received 35,803 shares of Shockwave common stock (the shares to which he was entitled following a reverse split of Shockwave common stock).

---

[2] The notice of appeal identifies not only the trial court's April 11, 2024 order but also its April 12, 2024 order on Todd's request for attorney fees and costs. Given the appellate briefing does not present any challenge to the latter order, we deem any such argument waived. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

At trial, Traci claimed that the warrant was a community asset omitted from the MSA. Her claim was based on the theory that DJT was formed during the marriage and Todd transferred his interest in DJT's intellectual property rights in exchange for the warrant he ultimately exercised.

Todd argued to the contrary that the warrant was not an omitted asset but, instead, his separate property under the terms of the MSA. Section 9.11 of the MSA is entitled "Waiver of Future Investment Opportunities" and reads, in pertinent part, that the parties "agree that any investment opportunities, business opportunities, or other income-producing opportunities that may accrue to either of them after the date of this Agreement shall be and remain their respective separate property and that the person acquiring the opportunity shall have no duty to notify the other or to share that opportunity with the other, even if the opportunity may be attributed to an asset or activity that accrued during marriage." (Boldface omitted.) Todd's expert testified that a warrant is an investment opportunity because it gives an individual or institution the opportunity to invest in a company by exercising the warrant and receiving common stock, and **[REDACTED]**.

The trial court rejected Traci's claim. It first explained that, under Delaware law, Todd's membership interest in DJT did not confer on him any ownership rights to its intellectual property. (6 Del. Code § 18-701 ["A limited liability company interest is personal property. A member has no interest in specific limited liability company property"].) It then pointed to the testimony from both parties' experts that the warrant was an investment opportunity, and the undisputed evidence that the warrant was issued years after the MSA was executed. Pursuant to section 9.11 of the MSA, the court found Todd had no duty to share this investment opportunity " 'even if the

4

opportunity may be attributed to an asset or activity that accrued during the marriage.' "

B. *Analysis*

Traci's primary challenge to the trial court's finding on the warrant is that the court failed to determine whether Todd's 29-percent *membership interest* in DJT was an omitted community asset. But that was not an issue the parties requested to be heard at trial. Traci and Todd stipulated to an itemized list of the "only pending requests before the Court." Those requests included whether the " 'DJT Warrants' are an undisclosed community asset that must be divided and/or subject to additional child support or spousal support." We see no basis to expand the scope of this stipulation. Traci points to various references made to Todd's membership interest before and during trial. But those references were related to her theory in claiming the *warrant* was an omitted asset: Traci argued that DJT was community property and that Todd transferred his interest in DJT's intellectual property rights in exchange for the warrant.

Traci cites Family Code section 2556 to suggest the trial court was *required* to divide Todd's membership interest in DJT. We disagree. Family Code section 2556 provides the court with "continuing jurisdiction" to award community estate assets "that have not been previously adjudicated by a judgment in the proceeding." It does not contain any requirement that the court adjudicate any omitted community asset, let alone that it do so in contravention of a stipulation by the parties identifying the only issues for trial.

Traci also argues that the stipulation did not preclude her from presenting an alternative theory—that Todd transferred his DJT *membership interest* (not his interest in DJT's intellectual property rights) in exchange for

5

the warrant—to support her claim that the warrant was an omitted community asset. But even assuming Traci did present such a theory, we are not persuaded that the court erred in rejecting it and finding, instead, the warrant was an investment opportunity that the parties agreed was Todd's separate property.

Traci contends otherwise by referencing the agreement between Shockwave and DJT terminating their prior license agreement, suggesting it is "*crystal clear*" that Todd received the warrant as compensation for his membership interest in DJT. But the express language of the warrant states it was granted **[REDACTED]**. And Traci offers no argument or authority challenging the trial court's conclusion that, under Delaware law, Todd's membership interest in DJT did not confer to him any ownership rights to its intellectual property.

Traci also cites Todd's testimony at trial that, **[REDACTED]**. But under section 9.11 of the MSA, the parties agreed that an investment opportunity accruing after the date of the agreement was separate property, "even if the opportunity may be attributed to an asset or activity that accrued during marriage." The evidence showing that Shockwave's grant of a warrant to Todd may have been attributed to his membership interest in DJT is entirely consistent with this provision. And the trial court's factual finding that the warrant was an investment opportunity is supported by substantial evidence. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94 [" 'The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial' "].) Both parties' experts testified that a warrant gives an individual the opportunity, not any obligation, to invest in a company, and the evidence

6

was undisputed that the warrant was granted almost two years after the parties executed their MSA.

Traci argues next that the trial court misinterpreted the MSA in three respects. "We construe a marital settlement agreement that is incorporated into a stipulated judgment under the general rules governing the interpretation of contracts." (*In re Marriage of Schu* (2014) 231 Cal.App.4th 394, 399.) "Where no extrinsic evidence is introduced, or the extrinsic evidence is not in conflict, we independently construe the agreement." (*Ibid.*)

First, Traci contends the trial court determined there was a "conflict" between section 9.3 and section 9.11 of the MSA, and resolved that conflict by determining the latter provision controlled. We disagree. Section 9.3 of the MSA states: "**[REDACTED]**" The trial court did not identify any conflict between the provisions. It determined the warrant was Todd's separate property as an "investment opportunity" under section 9.11 of the MSA, and not an undivided community asset.

Second, Traci argues that the trial court's interpretation of section 9.11 as a "waiver" of investment opportunities accruing after the date of the MSA is contrary to *Huddleson v. Huddleson* (1986) 187 Cal.App.3d 1564. That case is not on point: The parties there entered into a settlement agreement with no mention of the husband's pension, and the wife subsequently brought an action seeking distribution of the pension as an omitted community asset. (*Id.* at pp. 1567–1568.) The husband argued the wife had no interest in his pension because it vested after they separated (but before the judgment of dissolution). (*Id.* at p. 1568.) The appellate court rejected this argument, concluding the "crucial time to measure whether or not pension rights are vested is at the time of dissolution . . . ." (*Ibid.*) Here, unlike *Huddleson*, there are no pension rights at issue, and in any event, the warrant was

7

granted to Todd after both the MSA and the judgment of dissolution were entered.

Third, Traci argues that the trial court erred in its interpretation of the term "accrue" in section 9.11 of the MSA. She relies on *Hangen v. Hangen* (1966) 241 Cal.App.2d 11, 14, and dictionaries that define the word to mean " 'come into existence as an enforceable claim.' " Based on these definitions, she contends Todd accrued the warrant as he accrued his membership interest in DJT (and not when it was granted to him after the parties entered the MSA). We are not persuaded that such an interpretation is consistent with the language of the relevant sentence in section 9.11. (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 688 [marital settlement agreement must be read as a whole, giving effect to every provision and construing terms that do not render provisions meaningless or irrelevant].) That sentence in section 9.11 provides the parties "agree that any investment opportunities, business opportunities, or other income-producing opportunities that may accrue to either of them after the date of this Agreement shall be and remain their respective separate property and that the person acquiring the opportunity shall have no duty to notify the other or to share that opportunity with the other, even if the opportunity may be attributed to an asset or activity that accrued during marriage." These two separate references to different accruals—(1) accrual of the investment opportunity after the MSA and (2) accrual of the asset to which the investment opportunity may be attributable—contradict any suggestion that they be collapsed into one. We read section 9.11 to include the warrant as an investment opportunity that accrued to Todd in 2015, when Shockwave granted it to him.

8

In sum, we conclude the trial court did not err in finding Todd had no duty to share the warrant under the terms of the MSA.[3]

## II.  *Trial Court Did Not Err on Bonus Spousal Support*

### A.  *Additional Background*

In 2009, Todd entered into a consulting agreement with Shockwave for certain services, including the performance of studies and coordination of scientific advisor input.  **[REDACTED]**  (Boldface and italics omitted.)

Todd testified at trial that he was an employee of Stanford University but was allowed to do consulting for up to 20 percent of his working time.  He testified that he had consulted with other companies.  For Shockwave, Todd testified that he played an "advisory role" and received no instructions from Shockwave regarding the manner of performing his services.  He ran tests to determine the effectiveness of Shockwave's device to treat calcifications.  He made protocol decisions and acquired the tissue used to run the testing.  He used his own computer, software, and literature reviews.

While Todd was consulting for Shockwave, he was granted four "lots" of nonqualified stock options (NSO) that he exercised.  This included (1) 941,000 NSO's granted in February 2014; (2) 255,000 NSO's granted in May 2014; and (3) 1,560,000 NSO's granted in June 2015.  Todd testified at trial that he was granted these lots in connection with financing rounds that included other investors.  Todd's expert also testified that the lots were granted concurrently with rounds of funding.  **[REDACTED]**  The fourth lot of 350,000

---

[3] Given this conclusion, we need not address Traci's argument regarding what she should be awarded if the court were to find she was entitled to some share of the warrant.  Nor do we address her argument that if the trial court erred in failing to determine whether DJT was an omitted asset, remand would also be appropriate for further review of her claim that Todd "breached his fiduciary duties of disclosure to her with respect to DJT . . . ."

NSO's was granted in 2017, but Todd did not exercise those options or sell the stock until 2022.

At trial, Traci claimed she was entitled to bonus spousal support on Todd's income from the sale of this stock under the terms of the Stipulation. Section 5.1 of the Stipulation sets out monthly spousal support to be paid on Todd's base salary. Section 5.2 provides for bonus spousal support pursuant to *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33.[4] And section 5.4 states that spousal support "shall terminate on the earlier of January 31, 2022, Traci's remarriage, or the death of either party."

Section 5.2.b. is entitled "Smith/Ostler Support on Equity Compensation." (Underscoring omitted.) It begins: "In addition to his cash compensation, Todd may receive equity compensation for his employment services, as defined below." Section 5.2.b. identifies three categories as example sources of income on which Todd may owe bonus spousal support: employee stock options, employee restricted stock, and K-1 distributions from partnerships. Section 5.2.b.iv. then identifies certain exclusions from bonus spousal support, including that "if money is invested by either party into a company or business as part of a financing round with other investors, in exchange for equity in any form, that equity is not subject to a Smith/Ostler."

The trial court rejected Traci's claim for bonus spousal support on Todd's income from the sale of stock based on two alternative findings. It first found the lots were not equity compensation for " 'employment services' " under section 5.2.b. of the Stipulation. Given the Stipulation did not include

---

[4] "An *Ostler/Smith* provision is 'an additional award, over and above guideline support, expressed as a fraction or percentage of any discretionary bonus actually received.' " (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 949.) "Its purpose is to capture fluctuations in the supporting spouse's income that are not included in a flat rate amount of support." (*Ibid.*)

any definition of that term, the court considered whether Todd would have been properly classified as an employee (i.e., one who performed "employment services") or an independent contractor in his consultant role at Shockwave.

To answer this question, the trial court turned to *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*) and *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (*Borello*). In *Dynamex*, the California Supreme Court adopted the " 'ABC' test" utilized in other jurisdictions, under which a worker is properly considered an independent contractor if the hiring entity establishes: "(A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity." (*Dynamex*, at pp. 916–917.)[5] In *Borello*, the Court recognized that " '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired' " and identified other, secondary factors, including whether the one performing services is "engaged in a distinct occupation or business" and "supplies the instrumentalities, tools, and the place of work . . . ." (*Borello*, at pp. 350–351.)

The trial court concluded Todd would have been correctly classified as an independent contractor under either test. It cited Todd's testimony that

---

[5] We note the Legislature has "codified the 'ABC test' " from *Dynamex* in Labor Code section 2775. (*Castellanos v. State of California* (2024) 16 Cal.5th 588, 597.)

he received no instructions from Shockwave regarding the manner in which he performed his consulting services, was employed by Stanford University and consulted for other companies, ran tests to determine the effectiveness of Shockwave's device (not to improve or create Shockwave's manufacturing process for the device), and used his own tools for the work.

The trial court alternatively found the lots were excluded from bonus spousal support pursuant to other provisions in the Stipulation. It found the first three lots fell under a specific exclusion in section 5.2.b.iv. of the Stipulation because Todd invested money **[REDACTED]**. And it found the fourth lot was excluded under section 5.4 of the Stipulation because there was no evidence of any income received on that stock until after spousal support terminated on January 31, 2022.

B. *Analysis*

Traci presents four challenges to the trial court's findings on bonus spousal support. She first contends, without citation to any record of raising such argument below or supporting authority, that Todd should have been "estopped from asserting that he was not an employee" of Shockwave. We deem the argument waived. (Cal. Rules of Court, rule 8.204(a)(1)(B); *In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 510 [applying general rule that "parties cannot argue theories on appeal that they did not present in the trial court," including new theory that involves issues of fact that could be altered by the presentation of additional evidence].)

Even if not waived, we are not persuaded by the merits of the argument. " 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181.) Traci argues that Todd should have been estopped

12

from arguing he was an independent contractor for Shockwave because he filed a declaration in 2019 (three years before trial) in which he referred to himself as an "employee" of the company. But that declaration was not admitted into evidence at trial; nor does Traci point to any reference made to the statement contained therein. (See *In re Marriage of Pasco* (2019) 42 Cal.App.5th 585, 592 [abuse of discretion in reliance on declarations not admitted into evidence].) Traci alternatively argues that Todd should have been estopped because he did not disclose **[REDACTED]** as required by the MSA. But the trial court rejected Traci's argument that Todd was an employee of Shockwave who owed such duties, and that finding was supported by substantial evidence related to the performance of his services as a consultant for the company.

Second, Traci argues that the trial court erred by "hearing and considering" expert testimony in interpreting the terms of the Stipulation. Traci waived any evidentiary objection to this testimony. (Evid. Code, § 353, subd. (a) [decision based on finding not reversible for erroneous admission of evidence unless objection or motion to exclude or strike evidence was timely made].) Nor does she cite any expert testimony that constituted an improper opinion on legal conclusions. (*City of Rocklin v. Legacy Family Adventures-Rocklin, LLC* (2022) 86 Cal.App.5th 713, 728 ["an expert is not permitted to give an opinion on questions of law or legal conclusions"].) In response to Traci's position that certain definitions in the MSA be applied to the terms of the Stipulation, Todd's expert testified that "a 'best practice' when terms used in an agreement are to be imported into an amended or restated agreement is to include a transitional statement." The court rejected Traci's position upon determining that the MSA and Stipulation were two different agreements, negotiated at different times by different

attorneys, and the term "employment services" used in the Stipulation did not appear anywhere in the MSA. The court also noted that the Stipulation did not include any transitional statement. We see no basis to conclude that the trial court relied on improper expert opinions in its findings on bonus spousal support.

Third, Traci argues that the trial court erred in its interpretation of section 5.2.b. of the Stipulation. As a preliminary matter, we note this argument does not address the court's alternative finding that the lots were excluded under other provisions of the Stipulation. Any challenge to this alternative finding is waived. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 [failure to address alternative ground in opening appellate brief results in forfeiture].)

In any event, we are not persuaded that the trial court erred here. Traci contends that section 5.2.b. of the Stipulation covers Todd's income from Shockwave stock because he was a " 'service' provider." But we cannot and do not accept an interpretation that renders half of the term "employment services" meaningless. (*In re Marriage of Nassimi, supra*, 3 Cal.App.5th at p. 688.) Traci next contends that the parties did not intend for Todd's income from Shockwave stock to be excluded because otherwise they would not have added a specific exclusion in section 5.2.b.iv. for equity that was divided under the MSA. But that exclusion relates to stock issued during the marriage that the parties agreed were community property, not the four lots of stock obtained by Todd *after* the MSA was entered.

Traci also points to certain extrinsic evidence admitted at trial: specifically, a letter from Traci's attorney to Todd's attorney during negotiations of the draft Stipulation. In that letter, Traci's attorney asserts

14

that the term " 'equity compensation' " under section 5.2.b. of the draft should include compensation that "arises from an ownership interest in a partnership entity." But Traci does not sufficiently explain how this resolves the interpretation of the term "employment services" or shows error given the ample evidence supporting the court's finding that Todd's consulting work for Shockwave was not properly classified under that term. (See *Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1110 ["When an appellant challenges a trial court's interpretation of a written contract, the substantial evidence standard of review applies when the contract is ambiguous and conflicting extrinsic evidence is admitted to assist the court in interpreting the contract"].)

Finally, Traci argues that even if Todd's income from the sale of this stock were not subject to bonus spousal support under the Stipulation, the trial court should have limited that finding only to stock Todd "earned" or that "vested" after the Stipulation was entered (presumably, the fourth lot of NSO's). We disagree. Section 5.2.b. governs bonus spousal support on "additional income" Todd received from certain equity compensation. **[REDACTED]** The trial court correctly resolved the question of whether this income triggered bonus spousal support under section 5.2.b. of the Stipulation.

In sum, we conclude the trial court did not err in finding Traci was not entitled to bonus spousal support on Todd's income from the sale of the four lots of Shockwave stock.

## III. *Trial Court Did Not Err on Additional Child Support*

### A. *Additional Background*

In 2019, after Traci filed her request for order, Todd filed a request for order to modify child support. He argued there had been a change of

circumstances because he had new employment and either already received or expected to receive "substantial" income from the sale of the four lots of Shockwave stock. Among other things, he stated that "additional child support" was owed on some of this income but requested that it be capped based on the reasonable needs of the parties' remaining minor child.

Section 6.2 of the MSA is entitled "Additional Child Support" and provides that "Todd shall pay to Traci 8% of all gross income received by him in excess of $340,000 per year whether cash or equity." (Boldface omitted.) The Stipulation explicitly replaced section 6.2 of the MSA with the following provision. Section 6.2 of the Stipulation is entitled "Additional Child Support" and provides that "Todd shall pay to Traci a percentage of all gross income received by him in excess of $340,000, including but not limited to all cash compensation, equity compensation and royalty income." (Boldface omitted.) It then identified various percentages ranging from 5.7 to 8.5 percent over certain years from 2016 to 2022.

At trial, Traci claimed that Todd owed additional child support under these provisions. Traci's expert calculated the amount of such arrearages to be **[REDACTED]**. Todd argued for an alternative approach to the calculation under *In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361 because he reinvested the sale proceeds from the lots of Shockwave stock. (*Id.* at p. 1373 [in determining gross income for purposes of child support, "where the supporting party has chosen to invest his or her funds in non-income-producing assets, the trial court has discretion to impute income to those assets based on an assumed reasonable rate of return"].) Todd's expert calculated the amount of additional child support owed at $48,004, **[REDACTED]**.

16

The trial court concluded that the approach used by Todd's expert was "a more acceptable way" to calculate the additional child support owed, finding there was reinvestment of the proceeds and no income realized for the purpose of calculating income available for child support. The court adopted the $48,004 calculation as the additional child support owed by Todd. It declined to award interest, as the amount owed "was in dispute" and "could not be determined without a trial."

B.    *Analysis*

Traci challenges the trial court's finding on additional child support as an improper retroactive modification of such support. Family Code section 3603 provides that an order for child support "may be modified or terminated at any time except as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate." And Family Code section 3653, subdivision (a) provides, in relevant part, that an order "modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate . . . ."

We are not persuaded that the trial court's finding ran afoul of either statutory provision. Todd received income from the sale of stock years after the parties executed the MSA that was incorporated into the judgment. Questions subsequently arose regarding whether additional child support was owed from this income and if so the amount. The parties presented these questions for trial, and the court accepted the $48,004 calculation offered by Todd's expert. "Whatever the procedural context, a consideration whether a parent has satisfied or otherwise discharged a support obligation 'does not violate the prohibition against retroactive modification of the support award.'" (*In re Marriage of Robinson* (1998) 65 Cal.App.4th 93, 98.) "Nor are

17

the parties precluded from settling all disputes that might affect the calculation of arrearages." (*In re Marriage of Sabine & Toshio M.* (2007) 153 Cal.App.4th 1203, 1214.)

Traci also appears to argue the trial court improperly modified child support in the years 2016 to 2018, even though the income at issue and the filing of Todd's request for order occurred in **[REDACTED]**.  She refers to a single sentence in the report prepared by Todd's expert that he had done child support calculations "for the time period from January 1, 2016 through July 31, 2021."  But Traci offers no specific argument that the court did, in fact, determine additional child support owed in any year before 2019, instead appearing to concede that the court's finding related "as a practical matter back to 2019 . . . ."  We thus deem the argument waived.  (Cal. Rules of Court, rule 8.204(a)(1)(B).)  The trial court did not err in finding Todd owed $48,004 in additional child support.

## DISPOSITION

The April 11, 2024 order is affirmed.  Respondent is entitled to his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1)–(2).)

Jackson, P. J.


WE CONCUR:

Simons, J.
Burns, J.


A170623/*Brinton v. Brinton*