Filed 4/30/13  Toolan-Miller v. Yates CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ANNELIESE TOOLAN-MILLER, <br><br> Respondent, <br><br> v. <br><br> CREIG YATES, <br><br> Appellant. | D062129 <br><br><br> (Super. Ct. No. DN168760) |


APPEAL from an order of the Superior Court of San Diego County, David G. Brown, Judge.  Affirmed.


In this appeal, Creig Yates challenges an order permitting the mother of his child to move their child to Maryland.  He contends he was denied due process at the hearing on the move-away request because he was not afforded an evidentiary hearing, and the court abused its discretion in granting the move-away request.  We find no error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *General Background*

In about 2009, Yates (Father) and Anneliese Toolan-Miller (Mother) met online through a "raw food" Web site. Father (about age 40) was living in San Diego County. Mother (about age 20) was living in Maryland and attending college. Several months later, Father went to Maryland to meet Mother. They commenced a relationship and at some point began living together. In May 2011 Mother moved to California with Father, and in August 2011, their child (Child) was born.

Father, Mother, and Child were residing in San Diego County at the home of Father's mother (Paternal Grandmother). Father was employed when Child was born. While he was at work, Mother stayed at home and took care of Child. When Child was two months old, Father left his employment. Mother, who is a music teacher, had a part-time job teaching violin, but this employment ended in January 2012.[1] At the time of the proceedings before the trial court, Father stated he was employed and he "set his own hours."[2]

---

[1]   According to Mother, she was unable to continue teaching violin because (as will be discussed below) Father injured her arm during an altercation in January 2012.

[2]   Father said he was a licensed holistic health practitioner, and two months after Child's birth he left his employment due to a dispute over the percentage of money he was owed. Mother stated Father had not completed the requirements to obtain his license and hence he only works part time in "under the table" jobs.

2

As we shall detail below, in January 2012 (when Child was four months old) the parties were involved in an argument that escalated to a physical altercation, which resulted in Mother's arrest and an order that she move out of the residence. Both parties described their version of the incident at a lengthy hearing on the parties' respective requests for permanent restraining orders and temporary custody orders. Ultimately, mother was not charged for the domestic violence incident; the court denied the parties' requests for permanent restraining orders; and the court issued a temporary custody order providing for equally shared physical custody with exchanges made on a daily basis. Meanwhile, Mother, who was unemployed and living with a friend, filed a request to move with Child back to Maryland where she would have financial and emotional support from her family. Judge David Brown, who ruled on the permanent restraining order and temporary custody issues, also presided over the move-away hearing. Father now challenges the court's granting of Mother's move-away request on due process and substantive grounds.[3]

## B. *Restraining Orders and Temporary Custody Orders*

### 1. *January 2012 Incident and Temporary Restraining Orders*

The domestic violence incident occurred on January 6, 2012, while Father was driving on the freeway and Child was in the backseat with Mother. According to Father, during a verbal exchange between the parties, Mother started screaming at him and then

---

[3] Father filed a writ of supersedeas with this court requesting that we stay the order allowing Child to move to Maryland pending our decision on appeal. We denied this request.

attacked him. She struck him on the side of his head; dug her nails into his wrist; grabbed one of his fingers; and clawed at his face. Father grabbed and held Mother's wrist to stop the attack. When Father exited the freeway, he called the police. Father claimed there had been previous incidents when Mother had attacked him, including an incident when she clawed at his chest.

According to Mother, Father erupted in a "blind rage" while driving and was cursing at her. Father ignored her pleas to stop, and he started driving erratically on the freeway off ramp and surface streets. He was speeding and almost crashed into a car. To stop his behavior and get his attention, Mother grabbed Father's hair and continued to yell at him to stop. When they were parked in a parking lot, Father grabbed and twisted Mother's wrist, causing it to fracture. She stated she may have inadvertently scratched his face at some point during the incident. Mother claimed that during the previous incident of domestic violence referred to by Father, Father had cornered her in their bedroom and he was cursing at her, acting physically aggressive, and threatening to kill her. She claimed that other than this latter incident when she had to break free from Father, she never assaulted him.

When the police arrived at the time of the January 6 incident, they spoke with Father and Mother, concluded that Mother was the primary aggressor, arrested Mother,

4

and left Child with Father.[4]  At the time of the proceedings before the family court, the district attorney's office had not pursued charges against Mother based on this incident.

Because Child was in the car at the time of the altercation, Child Protective Services (CPS) was contacted about the incident.  On January 7, 2012, CPS formulated a safety plan recommending that Mother not be allowed to come to the family residence and have no contact with Child until an investigation was complete.

On January 9, 2012, both parties filed requests for restraining orders and for custody of Child.  The court granted each party a temporary restraining order (TRO) against the other, and ordered that Mother move out of the residence and that Father have temporary custody of Child with no visitation to Mother.  Mother found a place to live with a friend.

On January 19, 2012, Mother requested that she be granted visitation so she could continue breastfeeding Child.  CPS noted there was a bond between Mother and Child, and recommended supervised contact.  The court (Judge Sim Von Kalinowski) granted Mother supervised visitation pending the hearing on the domestic violence issue. Thereafter, Mother regularly visited with Child, during which times she breastfed Child. Mother's mother (Maternal Grandmother) had come to California from Maryland, and she accompanied Mother to the visitations.

---

[4]     The police photographed Father's injuries, including a scratch on the back of his head behind his ear, a scratch on the side of his face, and a laceration on his wrist.

The visitation monitor's declaration concerning the supervised visitations with Mother stated that Mother acted in a loving manner towards Child and Child responded appropriately. On some occasions Child became fussy when Mother attempted to nurse, but on other occasions Mother successfully nursed Child. During initial visitations, Mother failed to comply with the requirement that she bring all necessary supplies for Child; she eventually complied with this requirement. During a visitation at a restaurant, hot tea was accidentally spilled on Child's clothing when Mother was playing with Child on the table, but Child was not injured. Mother's attorney arrived at the end of a visitation in an attempt to personally serve Father, which was in violation of the visitation procedures. Mother violated the TRO during a visitation by still being in her parked car at the time of Father's arrival to pick up Child, and in response Father summoned the police. Based on these visits, the monitor concluded that Mother had difficulty following supervised visitation rules set forth in the policy and procedures manual, but Mother's parenting style was nurturing.

### 2. *February 2012 Hearing on Domestic Violence Issue and Temporary Custody Orders*

At a February 17, 2012 hearing on the parties' requests for permanent restraining orders and temporary custody orders, both parties were represented by counsel and they each testified at length before the court (Judge Brown). They presented detailed descriptions of their respective versions of the January 6 incident and of the previous incident of domestic violence, as summarized above. They also submitted evidence and

6

testified at length about their concerns regarding the other parent having custody of Child.

Father argued the court should issue a permanent restraining order and continue the supervised visitation for Mother because the evidence showed that on January 6 Mother was out of control; she "went off on [Father]"; and Father did not do anything but defend himself. Father cited a CPS finding that an allegation of general neglect by Mother was substantiated.[5] He also testified that Mother's continued breastfeeding of Child jeopardized Child's health because Mother had been diagnosed with a fungal infection (candida) that can be transferred by breastfeeding, and Father had seen symptoms of candida in Child including diaper rash and "white patches" on his tongue. Further, the visitation monitor's notes showed that Mother had spilled hot tea on Child during a visit at a restaurant.

Mother argued the restraining order should continue against Father because the evidence showed he went into a rage and "started driving crazy"; out of necessity Mother grabbed his hair; and he responded by grabbing and injuring her. She asserted that she posed no risk to Child, and she should be given equal custody pending the move-away hearing.

Mother testified she had never been diagnosed with candida; her medical examinations did not reveal any problems with breastfeeding Child; and Father had never complained about her breastfeeding before the January 6 incident. Regarding the spilling

---

5      CPS also found that an allegation of emotional abuse by Father was unfounded, and an allegation of emotional and physical abuse by Mother was also unfounded.

7

of hot tea at the restaurant, Mother testified the incident was an accident and Child was not injured, and Mother also noted the visitation monitor described her as having a nurturing parenting style.

Mother submitted two declarations from individuals opining about Mother's and Father's character. A friend of Mother's from college stated Mother was a "kind, compassionate, and nurturing" person, she was committed to a healthy lifestyle, and she took measures to ensure her baby's health when she discovered she was pregnant. The midwife who assisted with Child's birth stated that during meetings with the parties, Mother appeared to "shut down" around Father, and Father acted in a defensive, verbally combative, and controlling fashion when discussing the parties' lack of prenatal care and payment of the midwife.

After hearing the parties' testimony and arguments and reviewing the file, the court denied without prejudice both parties' requests for permanent restraining orders. The court concluded neither party had met its burden of proof to show who was actually responsible for the violence; nothing justified what they both did on January 6; and the court requested that they both "please be responsible and mature adult parents of this infant."

Regarding child custody, the court issued a temporary order awarding joint legal and physical custody to the parties until the permanent orders were decided at the move-away hearing. The court ordered that beginning the following day the parties should alternate physical custody on a daily basis at 10:00 a.m., with the exchanges to take place at the sheriff's station.

8

C.  *Move-away Request and Permanent Custody Orders*

On January 31, 2012, Mother filed a motion requesting legal and physical custody of Child and permission to move Child (now five months old) to Maryland, where she could live with Maternal Grandmother and have family support.

1.  *Family Court Services Recommendation*

To assist the court with the move-away issue, a Family Court Services (FCS) counselor met with each party on March 8, 2012.  The parents confirmed that Child was exchanged daily at the sheriff's station.  The counselor spoke to the parents and reviewed the court file, including the information about the January 2012 domestic violence incident.  The counselor stated she had "significant concerns" about both parents, and recommended that they take parenting and anger management courses.

The FCS counselor stated that the parents "have been at odds on how to raise" Child, which "led to an incident where [Mother] initiated a domestic violence incident where the father was scratched up behind his head and face and [Mother's] wrist was broken."  The FCS counselor noted the CPS finding of substantiated general neglect by Mother.  The counselor observed that Mother was "very young" and in San Diego away from her family and support system, and that she needed this support system.  The counselor opined that Mother's move-away request did not appear to be an attempt to thwart Father's parenting of Child, but rather was a request "of necessity as [Mother] has nowhere to stay and is not employed at this time."  The counselor noted that Mother was Child's primary caregiver prior to the court's involvement; after the January 6 incident Father was the primary caregiver for six weeks; and Child was currently switching

9

between the parents on a daily basis which made it difficult for Mother to breastfeed. The counselor assessed that at Child's age it was important for him to have a primary caregiver, and he needed stability and consistency in his daily routine.

The counselor recommended that the parents be awarded joint legal custody, with the primary residence with Mother, and that Mother be allowed to relocate Child to Maryland. She recommended that Father have visitation (daytime only) every six weeks for five days; that he provide Mother with a 14-day advance written notice of his intent to visit; and that Child not rotate between the parents until he is at least 18 months to two years old.

### 2. *April 2012 Hearing Granting Father's Request for a Continuance of Move-away Hearing*

At a scheduled April 3, 2012 hearing on the move-away request, Mother appeared with counsel and Father appeared in propria persona. Judge Jacqueline Stern presided over the matter, apparently because Judge Brown was unavailable. Father told the court that the FCS report was "highly flawed" and biased against him, and he asked the court for a continuance so he could obtain counsel. Mother's counsel objected to Father's request for a continuance, arguing that Father was simply trying to delay the case.

The court stated it did not like to continue these types of cases, but because Father was seeing Child every day and a move to Maryland would significantly alter this, it was "very important" that Father have an attorney represent him. In response to the court's inquiries, Father stated he had not retained an attorney for the move-away hearing because of funding problems, but he now had a loan from a friend and he would retain an

10

attorney "within the week."  Based on Father's promise that he would have an attorney, the court continued the hearing to May 8, 2012.  The court emphasized it was granting the continuance "very reluctantly" and there would be no further continuances.

### 3.  *May 2012 Move-away Hearing*

On May 8, 2012, the continued hearing on the move-away and permanent custody motions was convened before Judge Brown.  Child was now almost nine months old. Mother appeared with counsel, and Father appeared in propria persona.  Both parties submitted detailed declarations and other information to support their positions.  While at the hearing, Father also elaborated at length concerning the information he had set forth in his declaration.  Neither party objected to the court considering the declarations or other evidentiary matters prepared by each party.

Opposing Mother's move-away request, Father requested that he be awarded custody and that Mother be awarded reasonable visitation with no overnights.  Father stated that Mother had significant problems with physical anger outbursts and had failed to provide for Child's basic needs and had neglected Child.  In support, he cited her arrest on January 6, the ensuing CPS finding of general neglect, her continued breastfeeding even though her candida condition made her breast milk intolerable for Child's digestion, and the visitation monitor's logs describing her conduct during the supervised visitation. Further, he stated that Mother did not have a proper car seat for Child's age and failed to properly secure the seat to the car.

11

Regarding moving Child to Maryland, Father stated Maternal Grandmother was "unstable" and "extremely controlling." He also claimed there were no jobs in Maryland (which was one of the reasons why he and Mother had moved to California), and neither party had the means to pay for travel to Maryland for visitation.

Father said he had a deep bond with Child; he had taken care of all Child's needs, including taking him for his six-month check-up to a pediatrician, and Child was happy and familiar with his family, neighbors, and playmates in San Diego County. Contrary to Mother's claim, Father's house was clean and there was no hoarding. Father submitted a letter from Child's pediatrician stating Child's "feeding and his schedule are all appropriate."

In contrast, Mother requested that the court award her sole legal and physical custody and that Father's visits be supervised. She stated she was a fit and proper parent, whereas she was concerned for Child's safety and well-being with Father. Concerning her move-away request, she said that she had lost her job in San Diego teaching violin due to her arm injury caused by Father; employment opportunities were more plentiful in Maryland than in California; in Maryland she had "a home, family, and wonderful support system in place"; she would be able to return to teaching music; her mother and other family members would care for Child while she worked; and Child would be living in a spacious home in a safe area with regular social interaction with cousins and other family. Mother stated that Father's complaint that he did not have the financial means to travel to Maryland for visitation "could easily be remedied if [he] would just get a job."

12

Mother provided a letter from the district attorney's office showing charges had not been filed for the January 6 incident, and a letter from a medical doctor stating Mother does not have a candida problem. Regarding Father's complaints about Maternal Grandmother, Mother stated that although Mother and Maternal Grandmother did not always see "eye to eye" during Mother's adolescence, Mother now shared Maternal Grandmother's views on morals and child rearing. Mother said she had an appropriate car seat, and when Father called the police to have them check it, the police said it was "perfectly safe and properly installed."

Mother stated she has been taking parenting courses since June 2011, which program has provided her with baby items and counseling. Through counseling she came to understand that Father's actions towards her were abusive, not simply a minor anger management problem. She said that if she could not move Child to Maryland, she and Child "would suffer . . . psychological repercussions." She maintained that Father tries to "bully" her into doing everything he wants; he alternates between saying he wants nothing to do with her and calling her names and then begging her to get back together with him; and his "bully to beggar daily switch" makes it difficult to coparent and shows that he refuses to consider what is best for Child. Mother also said she was concerned for Child's safety with Father because Father and Paternal Grandmother were hoarders and their home was "crowded with junk" and "unfit" for a child.

13

During the hearing, Father argued there were multiple errors in the FCS counselor's report, and stated he wanted to cross-examine the FCS counselor and wanted a "full evidentiary hearing with witnesses and testimony . . . ." However, Father had not subpoenaed the FCS counselor (who was not present in court), and he apparently had no other witnesses that he was prepared to call to testify that day.[6] The court told Father that it would not continue the hearing to allow Father to subpoena the FCS counselor or to otherwise prepare for a full evidentiary hearing. The court noted that Father had told Judge Stern he had funds to retain an attorney and would do so within a week, and Judge Stern had advised him there would be no further continuances. The court stated the move-away request had been pending before the court for three months since January 31, 2012; Father had the FCS report for a month and he should have subpoenaed the FCS counselor if he wanted her to testify; a decision needed to be made about whether Mother could return with Child to her home in Maryland; and Father could not make a last minute request for a continuance and further delay the decision.

As to the merits of the move-away request, Father repeatedly urged the court to deny the move-away based on Mother's assault on Father on January 6. In response, the court stated that it had personally heard the evidence on the domestic violence issue at the February hearing and concluded that neither party met its burden on the issue. Father

---

[6]    Father told the court that he had called the FCS counselor to discuss her report, but she did not return his calls. However, Father apparently did not issue a subpoena to the counselor. When the court declined to continue the hearing and told Father that if he had any witnesses available he should call them to the stand, Father did not call any witnesses to the stand.

14

asserted that the attorney who represented him at the February hearing was incompetent and if Father was permitted to present evidence concerning the January 6 incident, the court would realize that its ruling had been erroneous and that Mother had violent tendencies. The court told Father that the move-away request was not "a contest" on the domestic violence issue which had already been resolved at a lengthy hearing, and instructed Father to focus his arguments on whether it was in Child's best interests not to allow the move to Maryland.

After lengthy discussions with Father on the above-described matters, and after hearing argument from Mother's counsel, the court granted Mother's move-away request. The court noted that Mother grew up in Maryland and she had family and employment possibilities there. The court stated that it found Father to be "completely without credibility"; concluded it was in Child's best interests to accompany Mother to Maryland; and cautioned that "if either side starts playing games" the court would take "another look at custody." Citing its February ruling, the court found there was no presumption related to domestic violence under Family Code section 3044 and stated it had considered the factors delineated in the Family Code and case authority relevant to a move-away request.[7]

_____

[7] Subsequent unspecified statutory references are to the Family Code. Section 3044, subdivision (a) provides that if a court finds a party has perpetrated domestic violence, there is a rebuttable presumption that an award of custody to the party is detrimental to the best interest of the child.

15

The court adopted the recommendations in the FCS report concerning custody and visitation, awarding the parties joint legal custody, primary residence with Mother, and (subject to a 14-day advance written notice) daytime visitation with Father for five days every six weeks. The court also ordered that the parties complete parenting and anger management courses; denied Father's requests for Mother to pay his travel fees for visitation to Maryland and attorney fees; ordered each side to pay their own attorney fees; and retained jurisdiction over child support.[8]

## DISCUSSION

### I. *Father's Due Process Challenges to Move-away Ruling*

Father argues the trial court violated his due process rights at the move-away hearing by (1) failing to grant him a continuance so he could subpoena the FCS counselor and prepare to make a full evidentiary presentation; (2) failing to allow him to call Mother to the stand; and (3) precluding him from presenting evidence on the domestic violence issue.

### A. *Relevant Law*

A party has a right to call witnesses to testify at a family law proceeding. (§ 217; *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1345, 1356-1357 (*Elkins*).) Pursuant to section 217, the court is required to receive relevant live testimony, absent good cause for refusing to receive the testimony. (§ 217, subds. (a), (b); see Cal. Rules of Court, rule

---

[8] At the May 8, 2012 hearing, the court ordered that Mother could move to Maryland immediately. However, on May 9, 2012, the court modified its order and imposed a 30-day stay on the move-away as required under Code of Civil Procedure section 917.7.

5.113.)  A party seeking to present live testimony from witnesses (other than a party) must file and serve a witness list prior to the hearing, and if the party fails to do so the court may grant a brief continuance for this purpose.  (§ 217, subd. (c).)  If the court ascertains there is good cause to deny the receipt of live testimony, the court must state its reasons for this finding.  (§ 217, subd. (b).)[9]

Declarations (in lieu of live testimony) generally constitute hearsay and are inadmissible at a family law trial; however, declarations may be considered by the court when authorized by statute, agreed to by stipulation of the parties, or when the parties fail to object to their admission.  (*Elkins*, *supra*, 41 Cal.4th at pp. 1354, 1359.)  The court is also authorized to consider the custody recommendation prepared by the FCS counselor.  (§ 3183, subd. (a); *In re Marriage of Slayton & Biggums-Slayton* (2001) 86 Cal.App.4th 653, 659.)

When a party requests a continuance to allow the presentation of witness testimony, the party must make an affirmative showing of good cause to justify the continuance.  (*Jensen v. Superior Court* (2008) 160 Cal.App.4th 266, 270-271; see *In re*

---

[9]     Section 217 states:  "(a)  At a hearing on any order to show cause or notice of motion brought pursuant to this code, absent a stipulation of the parties or a finding of good cause pursuant to subdivision (b), the court shall receive any live, competent testimony that is relevant and within the scope of the hearing and the court may ask questions of the parties.  [¶]  (b)  In appropriate cases, a court may make a finding of good cause to refuse to receive live testimony and shall state its reasons for the finding on the record or in writing. . . .  [¶]  (c)  A party seeking to present live testimony from witnesses other than the parties shall, prior to the hearing, file and serve a witness list with a brief description of the anticipated testimony.  If the witness list is not served prior to the hearing, the court may, on request, grant a brief continuance and may make appropriate temporary orders pending the continued hearing."

*Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 823.) "When a witness is not under subpoena, his or her absence generally does not constitute good cause for the continuance of a trial." (*Jensen*, *supra*, at p. 271.) " 'The decision whether to grant a continuance of a hearing to permit counsel to secure the presence of a witness rests in the sound discretion of the trial court. . . . "To establish good cause for a continuance, [a party has] the burden of showing that he had exercised due diligence to secure the witness's attendance . . . ." [Citation.]' " (*In re Chuong D.* (2006) 135 Cal.App.4th 1303, 1312-1313.) A pro. per. litigant is held to the same procedural rules as an attorney. (*Bianco v. California Highway Patrol* (1994) 24 Cal.App.4th 1113, 1125-1126.) On appeal, we review the denial of a continuance for abuse of discretion. (*Jensen*, *supra*, at p. 127.)

## B. *Denial of Continuance*

The record shows that in January 2012 Mother filed her move-away request, and in March 2012 the FCS counselor submitted her report recommending that the move-away request be granted. On April 3, 2012, the date scheduled for the move-away hearing, Father appeared in pro. per., told the court that he wanted to challenge the veracity of statements in the FCS counselor's report, and requested a continuance so he could retain counsel. The court reluctantly granted Father a one-month continuance until May 8, 2012, and expressly stated there would be no further continuances. Thus, at the time of the April 3 hearing, Father knew that he disagreed with the FCS report and wanted to challenge it, and knew that the matter would be heard on May 8 *and there would be no more continuances*.

18

Notwithstanding this awareness, Father arrived at the May 8 move-away hearing without having secured the attendance of the FCS counselor so that he could call her as a witness, and was apparently unprepared to make any further evidentiary presentation. Instead, when Father appeared he attempted to convince the court that he should be granted *another* continuance so that he could have more time to prepare the case for a full evidentiary hearing.

Father's right to present live testimony under section 217 does not translate into a right to ignore orders requiring the parties to be ready to present their cases in a timely manner. The court reasonably considered that the move-away case had been pending for three months; Father had been provided ample time to secure the attendance of witnesses at court and prepare his evidence; and Father knew there would be no additional continuances. Under these circumstances, the court had good cause to deny Father's request to continue the hearing for purposes of subpoening the FCS counselor or otherwise presenting live testimony or other evidence. The record does not show a denial of due process or an abuse of discretion in the court's refusal to grant a second continuance.

### C. *Mother's Testimony*

With respect to testimony from Mother, Father asserts that he "sought permission to ask [Mother] questions" and the court denied his request. The record does not support this claim. After denying Father's request for a continuance so he could prepare for a full evidentiary hearing, the court stated, "If you have witnesses, please call them . . . . Do you have any witnesses available?" Father responded by reiterating his claim that Mother

19

was abusive, but he did not attempt to call Mother to the stand.  Father had an opportunity to call Mother as a witness, and his claim of a due process violation in this regard is unavailing.

## D.  *Domestic Violence Issue*

Finally, Father asserts the court violated his due process rights by refusing to give him the opportunity to admit evidence or question witnesses about Mother's domestic violence.  He contends the court's reliance on the adjudication of the issue at the February hearing was improper because the issue of a restraining order was governed by a more stringent standard than the standard at the move-away hearing; the earlier ruling had no res judicata or collateral estoppel effect on the move-away issue; and the court should have considered the domestic violence issue as a factor that was relevant to the move-away request.

We do not construe the court's decision concerning the previously-adjudicated domestic violence issue as premised on res judicata/collateral estoppel principles.  (See generally *Keith R. v. Superior Court* (2009) 174 Cal.App.4th 1047, 1056 [domestic violence orders are not functional equivalent of final judicial custody determination].)  Rather, the record reflects that the trial court was satisfied that it had fully evaluated the domestic violence issue at the February hearing, and hence it exercised its discretion to rely on its previous resolution of the issue rather than to permit another round of litigation on the exact same matter at the move-away hearing.

A trial court may properly take judicial notice of records and orders in its own files, and matters that are judicially noticed have evidentiary value. (*In re Martin L.* (1986) 187 Cal.App.3d 534, 539.) Further, although a party has a due process right to present all competent, relevant, and material evidence, a trial court does not violate due process when it exercises its "power to rule on the admissibility of evidence, exclude proffered evidence that is deemed to be irrelevant, prejudicial or cumulative and expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact." (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291; see *People v. Mincey* (1992) 2 Cal.4th 408, 440; *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1099-1100, fn. 10.) On appeal, we review a trial court's evidentiary rulings for abuse of discretion, and the ruling will not be disturbed unless the court exceeded the bounds of reason. (*In re Marriage of Slayton & Biggums-Slayton*, *supra*, 86 Cal.App.4th at p. 661.)

Although the trial court was not legally bound by its February ruling on the domestic violence issue for purposes of the move-away hearing, the court's decision to rely on the evidence and ruling from the February hearing was reasonable and did not violate due process. The same judge presided at both the February and May hearings, and thus had personally heard all the evidence presented at the February hearing. Moreover, because the February hearing concerned both the issue of permanent restraining orders and temporary custody orders, the court's resolution of the domestic violence question at the February hearing necessarily took into consideration the question of whether an award of custody to Mother and/or Father would be safe for Child. After

21

hearing extensive testimony from both parties and considering the other evidence presented by the parties, the court decided it was safe for both parties to equally share custody of Child.

Given the thoroughness with which the court examined the domestic violence issue at the February hearing, including the issue of whether Child was safe in the custody of either party, Father has not shown the court violated his due process rights or abused its discretion when it declined to permit Father to submit further evidence on this same matter at the move-away hearing.[10]

## II. *Father's Substantive Challenges to Move-away Ruling*

Challenging the merits of the trial court's move-away decision, Father argues the trial court failed to consider all the relevant factors and erred in finding that a move to Maryland was in Child's best interest.

In a move-away case where the court is rendering a permanent physical custody order for the first time, the court makes a de novo decision based on the best interests of the child under all the circumstances.  (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31-32, 40; *Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1124-1125 (*Mark T.*).)  The court has wide discretion to choose a parenting plan and resolve the move-away issue in a manner that advances the best interests of the child, considering such factors as the child's

---

[10]     In his reply brief, Father asserts the court improperly rejected his request to have Paternal Grandmother testify.  The record does not indicate whether Paternal Grandmother was present in court, but even assuming she was, the record shows no error because Father proffered her testimony on the domestic violence issue.  As stated, the court reasonably determined that there was no need for additional evidence on this point because it had been thoroughly examined at the February hearing.

health, safety and welfare; any history of abuse by a parent; and the nature and amount of contact with both parents. (§ 3011; *Mark T.*, *supra*, at p. 1125.) Relevant factors include the children's interest in stability and continuity in the existing custodial relationship; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including their ability to communicate and cooperate and to put the child's interests above their own; the reasons for the proposed move; and the extent to which the parents are currently sharing custody. (*In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1101.)

In a move-away case where the parents have temporary or permanent joint physical custody of the child, the moving custodial parent need not show the move is necessary, and the nonmoving custodial parent need not show changed circumstances or detriment to the child; rather, the inquiry focuses on the child's best interests. (*Mark T.*, *supra*, 194 Cal.App.4th at pp. 1125-1126.) "The value in preserving an established custodial arrangement and maintaining stability in a child's life is obvious. But when the status quo is no longer viable and parents have joint custody, a court must review de novo the best interest of the child. It can fashion a new time-share arrangement for the parents." (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364.)

On appeal, we review orders granting or denying move-away requests for abuse of discretion. (*Mark T.*, *supra*, 194 Cal.App.4th at p. 1124.) "A trial court abuses its discretion if there is no reasonable basis on which the court could conclude that its decision advanced the best interests of the child." (*Ibid.*) We draw all reasonable inferences in support of the court's ruling and defer to the court's express or implied

23

findings when supported by substantial evidence. (*In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 548.) If a party does not request a statement of decision, we presume the trial court found every fact necessary to support its decision. (*In re Marriage of Sabine & Toshio M.* (2007) 153 Cal.App.4th 1203, 1219 (*Sabine*).)

Drawing all inferences in favor of the judgment, the record supports that the trial court properly considered the factors relevant to Mother's move-away request. The court stated that it had considered the relevant factors set forth in the statutes and case authority, and absent an affirmative indication to the contrary, there is no basis to conclude it failed to do so. Father did not request that the court state reasons or issue a written statement of decision; thus, this is not a case permitting a challenge based on a court's failure to make explicit findings. In the absence of a contrary showing in the record, we presume the trial court considered and weighed all the relevant factors. (*Sabine*, *supra*, 153 Cal.App.4th at p. 1219.)

Further, the record supports the court's decision to grant Mother's move-away request. The trial court found that Father was not a credible witness with respect to his assessment of Child's best interests, and we defer to this credibility resolution. (*Niko v. Foreman*, *supra*, 144 Cal.App.4th at p. 365.) Based on this adverse credibility determination, the trial court could reasonably find that it was in Child's best interests to primarily reside with Mother, not Father. Given Mother's youthful age and lack of family support and financial resources in San Diego, the court reasonably found that Child's best interests would be served by Mother's return to her family home in Maryland with Child. The court could consider that in Maryland, unlike in San Diego, Mother had the physical,

24

emotional, and financial assistance of Maternal Grandmother, and that Maternal Grandmother had demonstrated her willingness to assist Mother by her attendance at Mother's supervised visitations with Child.

Concerning Father's domestic violence claims, based on the detailed information supplied by the parties at the February hearing on the restraining order issue, the court could deduce that the general neglect finding by CPS concerning Mother was a reflection of her immaturity and troubled relationship with Father and that it did not show any problems with her care of Child. This conclusion was supported by the visitation monitor's assessment that Mother had a nurturing parenting style.

In support of his position that the court abused its discretion, Father cites a variety of factors, including that both parents were seeing Child every day in San Diego; Child was at an age where emotional bonds were being formed; moving Child to Maryland would disrupt Father's bond with Child; Mother did not have a job waiting for her in Maryland; Father has family (including his mother) in San Diego who can assist with Child's care; and the parties could not afford to pay for regular visitation given the distance of the move. Although these were relevant factors for the court to consider, they do not defeat the reasonableness of the court's decision to permit the move-away based on the factors delineated above.

Father also asserts the court should have denied the move-away request because Mother had not been cooperative with visitation. He has not cited to anything in the record showing that Mother failed to comply with the court's order that the parties exchange Child on a daily basis prior to the move-away hearing. To the extent Father

25

relies on alleged events occurring *after* the court's move-away order, these incidents are not before us in this appeal and any such claims are a matter for resolution at the trial court level in the first instance. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 405.)

Finally, Father contends the trial court erred because it failed to comply with the statutory mandate, set forth in section 3082, that upon request the court must state its reasons for granting or denying a joint custody request.[11] Father did not request that the court state its reasons. Thus, this contention fails. Alternatively, even if we liberally construe the record in Father's favor as including a request for reasons, the court's reasons are adequately set forth in the record.[12] During the course of its discussions with Father, the court stated that Mother grew up in Maryland and she had family and employment opportunities there, and Father was not a credible witness with respect to his views on Child's best interests. The court also referred to the FCS report, which emphasized Mother's youthful age and need for family support. This constituted an adequate statement of reasons to explain the court's decision to grant Mother's move-away request and hence deny joint physical custody.

---

[11] Section 3082 states: "When a request for joint custody is granted or denied, the court, upon the request of any party, shall state in its decision the reasons for granting or denying the request. A statement that joint physical custody is, or is not, in the best interest of the child is not sufficient to satisfy the requirements of this section."

[12] After the court issued its oral ruling, Father asked the court, "What are your findings so I understand it?" The court responded that it was adopting the recommendations in the FCS report.

The courts recognize that move-away cases typically "involve heart-wrenching circumstances[.]"  (*In re Marriage of LaMusga*, *supra*, 32 Cal.4th at p. 1101.)  Although we have no doubt that Father has a close bond with his son, when resolving Mother's move-away request the court was required to consider all the circumstances and make a ruling that best met Child's needs.  The trial court allowed Father to present his position in great detail, indicated that it had considered the relevant factors, and made a reasoned decision in this difficult arena.  The record supports the court's ruling.

DISPOSITION

The order is affirmed.  Appellant to pay Respondent's costs on appeal.


HALLER, Acting P. J.

WE CONCUR:


O'ROURKE, J.


AARON, J.