Filed 6/28/24  Fromm v. Wells Fargo Bank CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| KEITH M. FROMM,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>WELLS FARGO BANK, N.A. et al.,<br><br>    Defendants and Respondents. | B310116 consolidated with B312881<br><br>(Los Angeles County Super. Ct. No. BC719511) |

APPEALS from a judgment and postjudgment order of the Superior Court of the County of Los Angeles, Robert B. Broadbelt III, Judge.  Affirmed.

Law Offices of Keith M. Fromm, Keith M. Fromm, and Emanuel J. Abrishami, for Plaintiff and Appellant.

Shepard, Mullin, Richter, & Hampton, Mark G. Rackers and Anna S. Gouzoules, for Defendant Wells Fargo Bank, N.A.

No appearance for Defendant First American Title Insurance Company.

# I.  INTRODUCTION

The trial court sustained the demurrer of defendant Wells Fargo Bank, N.A., denying plaintiff Keith Fromm leave to amend his causes of action, except his breach of contract claim.  The court also denied plaintiff's postjudgment motion to vacate the dismissal order as void.

On appeal, plaintiff challenges the demurrer ruling as to each of his claims (except his negligence claim), as well as the order on his motion.[1]  We affirm the judgment and order.

# II.  FACTUAL BACKGROUND[2]

## A.  *September 2005 Loan*

### 1.  Payment Obligations

On September 26, 2005, in return for a loan secured by real property, plaintiff executed a promissory note (note) and deed of trust in favor of defendant in the amount of $3,500,000.  In the

---

[1]    We granted defendant's motion to consolidate the appeals from the judgment and the order.

[2]    We recite the facts as alleged in the complaint.  (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.)  Here, the complaint is comprised of 342 paragraphs, 116 pages, and 235 additional pages of exhibits, and includes numerous contentions, deductions, and legal or factual conclusions.  For purposes of our review, we will disregard all such matters and limit our recitation to the material factual allegations.  (*WA Southwest2, LLC v. First American Title Ins. Co.* (2015) 240 Cal.App.4th 148, 151.)

note, plaintiff promised to make "a payment on the first day of every month beginning November 01, 2005," and to make those payments "every month until [he had] paid all of the principal and interest and any other charges . . . that [he] may owe under [the note]."  All such amounts were required to be paid within 30 years—on or before the October 1, 2035, maturity date of the note.

For the first 10 years under the note, that is, until November 1, 2015, plaintiff was required to make monthly payments of interest only.  But, after the expiration of that period, he was required to make "fully amortizing principal and interest payment[s] . . ." pursuant to paragraph 3(C).  That paragraph stated that plaintiff would be given prior notice of the resulting change in his monthly payment:  "Before the effective date of any change in my monthly payment, [defendant] will deliver or mail to me a notice of the change" that will "include the title and telephone number of a person who will answer any question I may have regarding the notice."

### 2.    Right to Change Interest Rate

During the first five years, the monthly interest payments of $17,135.42 due under the note would be fixed at the annual rate of 5.875 percent.  Beginning on October 1, 2010, however, the monthly interest rate could change and then could "change on that day every 12th month thereafter."  The date on which the interest rate could change was referred to as the "'Interest Change Date.'"

3

3.    Calculation of Rate Change

Under paragraph 4(C), the annual rate change, if any, would be based on an index described in the note. Plaintiff's new interest rate would be calculated by defendant using the index and his new monthly payment would then be determined using that rate.[3]

Paragraph 4(E) of the note described when interest rate changes to plaintiff's monthly payments would become due and payable: "My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again."

4.    Rate Change Notice

Paragraph 4(F) of the note described the procedure by which plaintiff would be notified of any annual changes to his interest rate and monthly payments. "[Defendant] will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of the change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice."

---

[3]    Under the terms of the note, plaintiff's interest rate and monthly payments could and did change in his favor.

4

5.      Failure to Pay as Required

Paragraph 7 described the consequences if plaintiff failed to make payments when due under the note. Paragraph 7(A) provided, in pertinent part: "If [defendant] has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to [defendant]." Paragraph 7(B) added: "If I do not pay the full amount of each monthly payment on the date it is due, I will be in default."

B.      *Notice of First Principal Payment*

On August 31, 2015, plaintiff received a notice from defendant, dated August 21, 2015, advising him of changes to his interest rate and monthly payments effective November 1, 2015. The notice advised him that, as of November 1, 2015, his monthly payment would be "a fully amortized principal and interest payment." It also specified: the amount of that monthly principal payment, $10,513.99; his new interest rate, which increased from 2.875 percent to 3.125; the amount of his new interest payment, which increased from $8,383.76 to $9,112.78; and the amount of his monthly escrow payment,[4] which remained the same, $2,017.09. Finally, the notice informed plaintiff that his total monthly payment would increase from $10,400.85 to $21,643.86.

---

[4]     The deed of trust included a requirement that plaintiff make monthly payments to be escrowed for satisfaction of property taxes and insurance.

The notice included defendant's fax number, telephone number, address in Des Moines, Iowa, and hours of operation. It did not, however, include a title and telephone number for a person who could be contacted for answers to questions about the notice.

C.    *Notice of New Escrow Payment Amount*

In September 2015, plaintiff received a second notice dated August 24, 2015, advising that there was a shortage of funds in the escrow account for the payment of property taxes and insurance premiums. According to the notice, the amount needed to cover those annual expenses was short by $15,256.42 and, in addition to his current monthly escrow payment of $1,582.79, an additional monthly payment of $1,781.42 was needed to ensure payment of those expenses.

D.    *Plaintiff's Responses to the Payment Notices*

After receiving the notices about his new principal, interest, and escrow payments, plaintiff "called the generic call center at the phone number" provided on the notices, but was "shuffled from one uninformed and unaccountable telephone operator to another, without receiving meaningful or informed responses to his questions regarding the notices of change."

On November 30, 2015, plaintiff sent a letter informing defendant that he disputed the increase in monthly payments and that the notice of such increases was invalid. Among other things, defendant asserted that the notice of his new monthly principal and interest payment did not comply with paragraph

6

4(F)'s provision concerning the title and telephone number for a person who could answer his questions. Plaintiff maintained that the notice was "defective and of no effect" because the condition precedent to increasing his monthly payment—a notice that strictly complied with paragraph 4(F)—had not been satisfied and he therefore was only required to make his previous payment of $10,400.85, "not $22,679.56 as demanded in the defective notice."

Plaintiff's November 30, 2015, letter also stated that the notice of increase in his monthly escrow payments did "not comply with the requirements of the notices required under the Adjustable Rate Rider,[5] and, therefore, [was] invalid as well."

On February 17, 2016,[6] plaintiff sent a letter to defendant advising that, "each month," he would be "tendering the proper amount of the monthly payment, which [was] $10,400.85, each such check [would] be notated with a statement that it [was] a tender under [Civil Code s]ection 1485 and that it constitute[d] payment in full (Pursuant to Civil Code Section 1526), of such monthly payment that [was] due under the [l]oan."

---

[5] At the time he executed the note, plaintiff also executed an adjustable rate rider that restated the rate-change terms of the note and contained a rate-change notice provision identical to paragraph 4(F) of the note.

[6] Plaintiff alleged that he sent defendant written requests and billing error notices on December 15, 2015, December 30, 2015, January 22, 2016, February 17, 2016, April 21, 2016, and May 15, 2016.

7

E.    *Denial of Plaintiff's Loan Modification Application*

On June 17, 2016, defendant notified plaintiff that it had denied his loan modification application.[7]  On June 23, 2016, plaintiff sent defendant a letter in preparation for an appeal of the denial in which he posed 15 questions about the loan modification process.  In a recorded telephone conversation that same day with defendant's representative, Damon Fuger, plaintiff stated that his appeal could not be prepared until he had received answers to his questions, and Fuger "agreed to wait until [p]laintiff had received answers to the questions . . . before submitting [p]laintiff's 'Appeal' to the appropriate reviewing parties at [defendant]."

On June 30, 2016, defendant sent plaintiff a letter advising that it had denied his appeal, even though he had not yet submitted an appeal and had not authorized Fuger to submit an appeal on his behalf.  In a recorded telephone call that same day, plaintiff spoke to Fuger at length and, during the conversation, Fuger made statements that "established that the representations made to [him] by [defendant] in the June 23, 2016[,] conversation were false."  Fuger also made further false representations, including that plaintiff would receive answers to his June 23, 2016, questions; the loan modification application would be referred to a "higher level of management" whose members would contact plaintiff; and plaintiff would have an opportunity to submit a new modification application that would

---

[7]    As part of his breach of contract cause of action, plaintiff asserted that, in May 2016, he entered into an oral agreement pursuant to which defendant agreed to consider in good faith plaintiff's application for a loan modification.

8

be duly and fairly considered.  According to plaintiff, he did submit a new modification application in February 2017, but in March 2017, defendant "categorically refused" to consider it.

F.      *Tender of Partial Monthly Payments Due*

Beginning on August 1, 2016, plaintiff began sending defendant checks for the monthly installments due under the note in the amount $10,400.85.[8]  Each check contained, among others, notations stating "'PAYMENT IN FULL'" and "'ACCORD AND SATISFACTION'".  Defendant accepted and deposited the majority of those partial payments.[9]

G.      *Notice of Default*

On February 1, 2017, defendant served and recorded a notice of default.  The notice stated that the monthly installment of principal and interest that became due on September 1, 2016, and all subsequent installments had not been made.  According

---

[8]      By a check dated August 1, 2016, plaintiff tendered a payment of $10,400.85 for the September 2016 monthly payment; and by eight separate checks dated October 7, 2016, plaintiff tendered payments in that amount for the months of October through December 2016 and January through May 2017. Plaintiff subsequently tendered checks in that same amount for the months of June through December 2017 and January through July 2018.

[9]      Defendant refused to accept and returned the checks for January, June, and July 2017.

to the notice, the amount past due as of January 30, 2017, was $113,205.80 and that amount would increase until paid in full.

Defendant attached to the default notice a declaration of compliance executed by a vice-president pursuant to Civil Code section 2923.55, subdivision (c).

On March 14, 2017, plaintiff sent defendant a letter demanding that defendant terminate the nonjudicial foreclosure and "cease its demand for monies" to which defendant was not entitled, "including the monthly installments falsely claimed to be in default, and the trustees fees, legal fees, late fees and other delinquency related fees . . . ." After receiving the letter, defendant "refused to take any steps to correct the illegality" of the default notice and declaration of compliance or stop the nonjudicial foreclosure.

## III.    PROCEDURAL BACKGROUND

On August 27, 2018, plaintiff filed a complaint[10] against defendant and the trustee under the deed of trust, First American Title Insurance Company,[11] alleging 13 causes of action against defendant, including for: civil extortion; fraud; treble damages under Penal Code section 496; breach of contract; negligent misrepresentation; negligence; violation of Business

---

[10]    Two months after plaintiff filed his complaint, defendant sent him a notice confirming that he had paid off the balance of his loan in full after he apparently refinanced with another lender.

[11]    Codefendant First American Title Insurance Company did not make an appearance on appeal.

10

and Professions Code section 17200 et seq. (UCL); declaratory relief; injunctive relief and damages under Civil Code sections 2924.12, 2924.19, and Code of Civil Procedure section 525.[12]

Plaintiff's complaint was based, in large part, on two theories of recovery:  (1) receipt of an annual rate-change notice in compliance with paragraphs 3(C) and 4(F) was an implied condition precedent to his obligation to pay increased monthly mortgage payments (conditional obligation theory);[13] and (2) the partial monthly payments he tendered to defendant constituted accords and satisfactions that extinguished his obligation to pay the increased amount of the monthly payments (accord and satisfaction theory).

On March 4, 2019, defendant demurred to the complaint, challenging the legal sufficiency of each of the causes of action. Plaintiff opposed the demurrer, and defendant replied.

On November 17, 2020, the trial court held a hearing on the demurrer and sustained it as to each cause of action without leave to amend, except as to the breach of contract claim for which the court granted leave.  Following the court's ruling, plaintiff sought clarification of the order granting him leave to

---

[12]     The complaint also asserted four federal claims for: damages under 12 U.S.C. section 2605; mail fraud; wire fraud; and RICO violations (18 U.S.C., § 1961 et seq.).  But plaintiff dismissed those claims in response to defendant's removal of the action to federal district court, which resulted in a remand of the action to state court for proceedings on the state law claims only.

[13]     Plaintiff asserts that paragraphs 3(C) and 4(F) are also concurrent conditions that must be satisfied prior to any increased payment obligation and material terms of the note, the breach of which excuses the increased payment obligation.

amend, asking whether it prevented him from predicating a breach of contract claim on paragraphs 3(C) and 4(F). In response, the court stated: "I'm not making any advisory rulings on any future demurrers. I'm granting plaintiff leave to amend the fifth cause of action for breach of contract."

On December 21, 2020, plaintiff filed a notice of his election to stand on his complaint and not to file an amended complaint.

On January 15, 2021, the trial court entered a judgment of dismissal, and on January 25, 2021, plaintiff filed a notice of appeal from the judgment.[14]

On the same day that he filed his appeal from the judgment, plaintiff filed a motion to set aside the order sustaining the demurrer, contending it was void. Following opposition and reply briefs, on March 4, 2021, the trial court denied the motion. On April 5, 2021, plaintiff filed a notice of appeal from that order.

## IV. DISCUSSION

### A. *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their

---

[14]    On appeal, plaintiff does not challenge the trial court's ruling sustaining the demurrer to his negligence claim.

12

context.  [Citation.]  When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.]  And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment:  if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.  [Citations.]  The burden of proving such reasonable possibility is squarely on the plaintiff.  [Citation.]"  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

B.    *Accord and Satisfaction Theory*

Plaintiff contends that the trial court erred when it made purported findings of fact on his accord and satisfaction theory.  He also contends that the court erred when it "held that no accord and satisfaction had been sufficiently alleged.  The verified complaint sufficiently alleged accords and satisfactions."  (Emphasis omitted.)  We disagree.

Plaintiff did not expressly allege a cause of action for accord and satisfaction.[15]  Instead, he alleged that defendant extorted him to make monthly payments even though it "had conclusive notice of the accords and satisfaction" (emphasis omitted).  According to plaintiff, even assuming the November 1, 2015, notice obligated him to pay increased interest, a new principal

---

[15]    Generally, the doctrine of accord and satisfaction is not asserted as the basis for a claim for relief; it is an affirmative defense to a claim for money owed.  (See *Bii Fin. Co. v. U-States Forwarding Service Corp.* (2002) 95 Cal.App.4th 111, 126.)

amount, and an increased escrow amount, that obligation was extinguished under the doctrine of accord and satisfaction.

"An accord and satisfaction is the substitution of a new agreement for and in satisfaction of a preexisting agreement between the same parties.  The usual purpose is to settle a claim at a lesser amount." (*In re Marriage of Thompson* (1996) 41 Cal.App.4th 1049, 1058.)  "A defendant asserting the defense of accord and satisfaction must establish '(1) that there was a "bona fide dispute" between the parties, (2) that the debtor made it clear that acceptance of what he tendered was subject to the condition that it was to be in full satisfaction of the creditor's unliquidated claim, and (3) that the creditor clearly understood when accepting what was tendered that the debtor intended such remittance to constitute payment in full of the particular claim in issue.'" (*BII Finance Co. v. U-States Forwarding Services Corp.*, *supra*, 95 Cal.App.4th at p. 126.)[16]

---

[16]     Plaintiff also claims that his increased payment obligations under the note were extinguished under Commercial Code section 3311 which, in essence, codifies the doctrine of accord and satisfaction as applied to commercial notes by providing, in pertinent part:  "(a) If a person against whom a claim is asserted proves that (1) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (2) the amount of the claim was unliquidated or subject to a bona fide dispute, and (3) the claimant obtained payment of the instrument, the following subdivisions apply.  [¶]  (b) Unless subdivision (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim."

14

"But an accord and satisfaction requires the existence of a bona fide dispute concerning the debt." (*In re Marriage of Sabine and Toshio M.* (2007) 153 Cal.App.4th 1203, 1215.) It must be predicated upon a "real dispute" and not on "a mere refusal to pay an undisputed claim." (*Kelly v. David D. Bohannon Organization* (1953) 119 Cal.App.2d 787, 792.) "[A]n agreement of accord and satisfaction presupposes a prior controversy concerning the relative rights of the parties under the pre-existing agreement . . . ." (*Everhardy v. Union Finance Co.* (1931) 115 Cal.App. 460, 464.) "'Performance of a legal duty to a promisor which is neither doubtful nor the subject of honest dispute is not consideration . . . .'" (*In re Marriage of Sabine and Toshio M., supra*, 153 Cal.App.4th at p. 1215.)

According to plaintiff, he sufficiently alleged the existence of a bona fide dispute. We set forth here the totality of his argument on this issue: "***ESSENTIAL ELEMENT NO. 2: the amount of the claim was unliquidated or subject to a bona fide dispute,*** (i.e. the *bona fide dispute* that the amounts being claimed by [defendant] were either not due (e.g. non-compliant [notices of rate and monthly payment changes], non-satisfied mutually dependent and concurrent conditions, excused by material breach, and/or included excessive **CLAIMS IN UNLIQUIDATED AMOUNTS** comprising *estimated* amounts for property taxes and insurance (e.g. [citations to the complaint.])"

Plaintiff's accord and satisfaction theory appears to be premised on his contention that he had no obligation under the note to make the increased interest payment, the new principal payment, or the increased escrow payment set forth in the August 21 and 24, 2015, notices, unless and until he received

15

from defendant the title and phone number of a person who could answer questions about those increased payments. He bases this contention on his interpretation of paragraphs 3(C) and 4(F) as either an implied condition to his payment obligations under the note or a material term.

Ordinarily, interpretation of a contract provision is a question of law for the court. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 ["It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence"].) "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.)" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

"'The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the contract. [Citation.]' [Citation.] But 'stipulations in an agreement are not to be construed as conditions precedent unless such construction is required by clear, unambiguous language; and particularly so where a forfeiture would be involved or inequitable consequences would result. [Citations.]' [Citations.] Because 'such conditions are not favored by the law, [they] are to be strictly construed against one seeking to avail [it]self of them. [Citations.]' [Citation.]" (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 593–594.)

16

Here, the payment terms of the note are unambiguous and provide that: (1) plaintiff would make installment payments due under the terms of the note "every month" through and including the October 1, 2035, maturity date of the note; (2) plaintiff's interest rate could change annually beginning October 1, 2010, and the new rate would be effective on the Interest Change Date; (3) plaintiff would "pay the amount of [his] new monthly [interest] payment beginning on the first monthly payment date after the Interest Change Date until the amount of [his] monthly payment change[d] again"; and (4) plaintiff was obligated to make the first monthly principal payment on the "First P[rincipal & Interest] Payment Due Date", namely, November 1, 2015. Thus, the express terms of plaintiff's payment obligations cannot reasonably be construed as creating a conditional obligation to make monthly payments.[17]

To the extent plaintiff further contends that the amount of the debt was disputed because notice of the title and phone number of a person who could answer questions was a condition to defendant's right to payment under the note, again we disagree. Indeed, there is nothing about the language of paragraphs 3(C) or 4(F) that suggests failure to provide that contact information would excuse indefinitely plaintiff's payment obligations under the note.

_____

[17] The language of the deed of trust also demonstrates that plaintiff's obligation to make monthly escrow payments was unconditional: "[Plaintiff] shall pay to [defendant] on the day Periodic Payments are due under the [n]ote, until the [n]ote is paid in full, a sum . . . to provide for payment of amounts for: (a) taxes and assessments . . . and (d) [m]ortgage [i]nsurance . . . ." "Periodic Payment" is defined as "the regularly scheduled amount due for (i) principal and interest under the [n]ote . . . ."

17

We also conclude that there is no legal basis for plaintiff's contention that the contact information promised in paragraphs 3(C) and 4(F) was a material provision of the note, the breach of which excused plaintiff's monthly payment obligations indefinitely. "The courts have come up with numerous ways of speaking about 'material' breaches of contract. Thus, it has been said that a 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract. . . . [F]or a breach of contract to be material, it must 'go to the root' or 'essence' of the agreement between the parties, or be 'one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'" (23 Williston on Contracts (4th ed. 2002) § 63:3, p. 438–439, fns. omitted; see also *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1051 ["The law sensibly recognizes that although every instance of noncompliance with a contract's terms constitutes a breach, not every breach justifies treating the contract as terminated"].)

Here, the contact information provisions of paragraphs 3(C) and 4(F) cannot be reasonably interpreted as material terms of the note as they did not go to the essence of the agreement. (*Westlands Water Dist. v. All Persons Interested* (2023) 95 Cal.App.5th 98, 127 ["A 'material term' is defined as a 'contractual provision dealing with a significant issue such as subject matter, *price, payment*, quantity, quality, duration, or the work to be done'"]; *Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 115 ["The material terms of a loan include the identity of the lender and borrower, the amount

18

of the loan, and the terms for repayment"].)  Thus, defendant's failure to provide the contact information did not excuse plaintiff's obligation to make monthly payments under the note, as a matter of law.  Accordingly, the "dispute" plaintiff claims to have compromised was not bona fide and could not have been the basis of an accord and satisfaction.

C.    *Extortion Cause of Action*

Plaintiff next argues that his first cause of action adequately stated a claim for civil extortion.  According to plaintiff, "[b]ecause, through the accords and satisfactions and other grounds, at the time that [defendant] threatened and commenced foreclosure, [he] did not owe [defendant] any monthly payments and was not in default, [defendant's] threats of foreclosure and the foreclosure itself were illegal and constituted an *unlawful threat of injury to* [plaintiff's property] and to [plaintiff] himself."

As we discuss above, plaintiff's complaint did not sufficiently allege that his increased monthly payment obligation under the note was discharged based on a theory of accord and satisfaction.  Therefore, plaintiff did not sufficiently allege that the nonjudicial foreclosure proceedings were unlawful or that the notices of default and related documents and letters sent by defendant were knowingly false, as required for a civil extortion claim.  (*Fuhrman v. California Satellite Systems* (1986) 179 Cal.App.3d 408, 426, overruled on other grounds by *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.)

To the extent plaintiff's civil extortion claim is separately predicated on the allegedly false declaration of noncompliance

that accompanied defendant's notice of default in violation of the Homeowner's Bill of Rights (Civ. Code, § 2923.4 et seq.), defendant's conduct in sending that declaration is subject to the protections of Civil Code section 2924, subdivision (d) which makes the sending of required notices privileged under Civil Code section 47.

D.     *Fraud and Negligent Misrepresentation Causes of Action*

Plaintiff next contends that he sufficiently pleaded the elements of the second and sixth causes of action for fraud and negligent misrepresentation and the trial court therefore erred in ruling that the economic loss rule barred his claims.

"The elements of fraud are "'(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" [Citations.] The elements of negligent misrepresentation are similar to intentional fraud except for the requirement of scienter; in a claim for negligent misrepresentation, the plaintiff need not allege the defendant made an intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believing the statement to be true. [Citations.]" (*Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 184–185, fn. omitted.)

In *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905 (*Sheen*), the court explained that generally tort claims that arise from the parties' underlying contract are barred by the economic loss doctrine. In that case, a borrower sued Wells Fargo for negligence alleging a duty to "'process, review and respond carefully and completely to [a borrower's] loan modification

20

application,' such that upon a breach of this duty the lender may be liable for the borrower's economic losses—i.e., pecuniary losses unaccompanied by property damage or personal injury[.]" (*Id.* at p. 915.)

The court in *Sheen, supra*, 12 Cal.5th 905, rejected the plaintiff's tort theory of recovery in the context of a home loan, reasoning as follows: "Plaintiff's claim arises from the mortgage contract he had with Wells Fargo, and as such, falls within the ambit of the economic loss doctrine. That judicially created doctrine bars recovery in negligence for pure economic losses when such claims would disrupt the parties' private ordering, render contracts less reliable as a means of organizing commercial relationships, and stifle the development of contract law. [Citations.]" (*Id.* at p. 915.)

To the extent plaintiff's fraud and negligent misrepresentation claims are based upon Fuger's alleged June 2016 oral misrepresentations during the loan modification process, those claims are barred by the economic loss doctrine. Those statements arose from either the parties' loan agreement or the alleged separate oral agreement to consider plaintiff's modification application in good faith, and not from any independent duty arising from tort law. (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 988, 990 [Economic loss rule "'prevent[s] the law of contract and the law of tort from dissolving one into the other'"; thus, a party alleging fraud or deceit in connection with a contract must establish tortious conduct independent of a breach of the contract itself, that is, violation of "'some independent duty arising from tort law'"]; see also *Tenzer v. Superscope* (1985) 39 Cal.3d 18, 30 ["'something

21

more than nonperformance is required to prove the defendant's intent not to perform his promise'"].)

Plaintiff's fraud in the inducement claim—based on the alleged false promises to provide notice in compliance with paragraphs 3(C) and 4(F)—also fails as a matter of law under the economic loss doctrine. Those promises were allegedly made as part of the loan agreement and the duty to comply with them therefore arose from the contract itself, and not from any independent tort duty.

In addition, plaintiff's fraudulent inducement claim is deficient because he cannot allege either the requisite intent to induce reliance or actual reliance. As explained, the contact information required by paragraphs 3(C) and 4(F) was not a material term of the note; thus, a reasonable borrower would not have relied on misrepresentations concerning such collateral information in making a decision whether to commit to the 30-year, $3.5 million loan payment obligation and to encumber his property in that amount. (See *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 [in the context of a fraudulent inducement claim, a "misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'"].)


E.    *Penal Code Section 496 Cause of Action*

Plaintiff also contends that he sufficiently pleaded a cause of action for treble damages under Penal Code section 496, (section 496). According to plaintiff, his allegations of extortion showed that defendant had received monies obtained by means of

22

that offense and therefore satisfied the pleading requirements for a civil cause of action under section 496, subdivision (c).

Section 496, subdivision (a) provides in pertinent part: "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of [Penal Code] Section 1170."

Section 496, subdivision (c) provides: "Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

Section 496, subdivision (a) defines the offense of buying or receiving monies that have either been stolen or obtained by means of extortion by someone other than the defendant. Plaintiff did not allege that defendant bought or received money from some other person or entity who had extorted funds; he alleged that defendant directly extorted money from him. His claim is therefore legally deficient on its face.

F.     *Breach of Contract Cause of Action*

On his breach of contract claim, plaintiff argues that his complaint stated "*dozens* of breaches" by defendant of the promissory note, adjustable rate rider, and deed of trust. He therefore concludes that the trial court erred by basing its ruling

23

solely on the conditional obligation theory under paragraphs 3(C) and 4(F).

To allege a cause of action for breach of contract, a plaintiff must allege, "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." (*Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 830.)

Contrary to plaintiff's assertion, the vast majority of his breach of contract allegations deal with either the conditional obligation theory based on noncompliance with paragraphs 3(C) and 4(F) or the accord and satisfaction theory and the related assertion that he was not in default because his duty to make full monthly payments had been extinguished. Thus, the trial court did not err in sustaining the demurrer to the contract claim to the extent that claim was based upon either his conditional obligation or accord and satisfaction theories and sought damages pursuant to those theories.

Moreover, to the extent the contract claim sought damages for breaches of the promises in paragraphs 3(C) and 4(F) under a theory that was independent of plaintiff's conditional obligation claim, the trial court granted him leave to amend the complaint to state such theories. Because plaintiff declined leave and chose instead to stand on his pleading, we need not consider whether an amended complaint that alleged a contract claim based on breaches of the promises in paragraphs 3(C) and 4(F) would have survived demurrer. (*Ingram v. Glissman* (1956) 145 Cal.App.2d 418, 420 ["Appellant declined to amend, although granted leave to do so. He must, then, stand upon his pleading as against all the grounds of demurrer. If the complaint is vulnerable to any of the grounds stated in the demurrer, the judgment must be

24

affirmed"].)  Similarly, even if we assume that somewhere in the dense "allegations" that purportedly support the breach of contract cause of action, there are other actionable breaches of obligations not tied to the two overarching theories, plaintiff declined to amend his compliant.  Accordingly, plaintiff has failed to demonstrate reversible error on appeal.  (*Id*. at p. 421.)

G.    *UCL Cause of Action*

Plaintiff maintains that the allegations of the complaint adequately state a cause of action for violation of the UCL and that the trial court therefore erred by "disregard[ing] all of the dozens of allegations of [defendant's] wrongdoing alleged in the [f]raud, [e]xtortion, [and b]reaches of the [i]mplied [c]ovenant of [g]ood [f]aith and [f]air [d]ealing claims as well as the many [Homeowners Bill of Rights] violations pleaded in the [complaint] . . . ."

"The California unfair competition law (UCL) ([Bus. & Prof. Code,] § 17200) defines "'unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."'  [Citation.]  A UCL action "'is not an all-purpose substitute for a tort or contract action."  [Citation.]  Instead, the act provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices.  . . .  [T]he "overarching legislative concern [was] to provide a streamlined procedure for prevention of ongoing or threatened acts of unfair competition.'"  [Citation.]  As a result, the remedies available to private individuals for violation of the UCL are limited to

25

restitution and injunctive relief; damages cannot be recovered. [Citations.] [¶] Because the statute "'is written in the disjunctive, it establishes three varieties of unfair competition— acts or practices which are unlawful, or unfair, or fraudulent.'" [Citations.]" (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 609–610.)

Although plaintiff complains that he pleaded dozens of unlawful, unfair, or fraudulent practices independent of the two primary theories upon which his UCL claim could be predicated, he specifically pleaded in the cause of action itself only: (1) extortion (Penal Code, §§ 518, 523); (2) theft and receiving stolen property (Penal Code, §§ 484, 487, 496); and (3) violation of the Homeowner Bill of Rights (Civ. Code, §§ 2924.17, 2923.55, 2923.5).[18] And, in the next paragraph of the complaint, he alleged that the unfair practices of which he complained were all predicated on defendant's conduct in support of either the conditional obligation or accord and satisfaction theory. The court therefore did not err when it granted the demurrer on this claim.[19]

---

[18] Plaintiff also specified the practice of negligent loan servicing in violation of Civil Code section 1714, subdivision (a), but, as explained, he did not pursue on appeal his negligence claim based on that same theory in light of *Sheen, supra*, 12 Cal.5th 905. He also specified violations of certain federal statues, but as noted, he dismissed all of his federal statutory claims during the removal proceedings and he does not assert authority that would allow him to reassert such claims under the guise of a UCL claim.

[19] Plaintiff also suggests that the alleged conduct underlying his fraud claim is sufficient to state a UCL claim under the fraud

26

H.    *Declaratory Relief and Injunctive Relief*

        Plaintiff complains that the trial court "shirked" its duty to rule on declaratory relief and injunctive relief claims.  According to plaintiff, many of the matters upon which he sought a declaration of rights had nothing to do with the conditional obligation or accord and satisfaction theories; and his claim for injunctive relief could have been amended to state a claim for damages based on violation of the Homeowner Bill of Rights.

        Contrary to defendant's assertion, with only one exception, each of the matters which plaintiff specified in his complaint as ripe for a declaration of rights was based on one of the two primary theories of recovery underlying the complaint.  In paragraph 327, plaintiff listed in subparagraphs (a) through (u) 21 separate requests for binding judicial declarations. Subparagraphs (a) through (i) and (q) each expressly mentioned rights and obligations under paragraphs 3(C) and 4(F) of the note.  Similarly, subparagraphs (j) through (m) each sought declarations related to the legal effect of the tenders of partial monthly payments.  And, subparagraphs (n) through (p) and (r) through (t) sought declarations based on plaintiff's flawed legal assertion that he was excused from making monthly payments and corresponding conclusion that all of defendant's actions in relation to the foreclosure were therefore unauthorized under the agreement.

---

prong, even if such conduct is not actionable as a breach of contract due to the economic loss doctrine.  But plaintiff cites no authority for the proposition that conduct of parties to a contract, which is not actionable fraud as a matter of law, may nevertheless support a UCL claim.  We therefore do not address the contention further.

27

The only specific request that arguably sought a declaration of a contractual right not intertwined with the two overarching theories was made in subparagraph (u), which asked for a sweeping declaration that defendant violated the Homeowner Bill of Rights, without specifying which provision or provisions of that act were violated.

Plaintiff's argument in support of his cause of action for injunctive relief based on alleged violations of the Homeowner Bill of Rights is equally flawed. That cause of action sought only one form of relief: an injunction under Civil Code sections 2923.5 and 2924.17 to prevent the nonjudicial foreclosure proceedings that were allegedly ongoing at the time the complaint was filed. It made no mention of a claim for damages.

Moreover, the record demonstrates that plaintiff refinanced his property and paid off his loan with defendant shortly after he filed his complaint. Thus, there are no foreclosure proceedings currently pending, and plaintiff fails to explain how the trial court could grant the injunctive relief sought even if we reversed the ruling on this cause of action. His appeal from the ruling on the injunctive relief claim is therefore moot. (See *MaJor v. Miraverde Homeowners Assn.* (1992) 7 Cal.App.4th 618, 622–623.)

I.      *Motion to Set Aside*

Plaintiff separately appeals form the trial court's order denying his postjudgment motion to vacate the dismissal order under Code of Civil Procedure section 473, subdivision (d), arguing that (1) he alleged facts sufficient to state an accord and satisfaction and (2) the trial court made an unauthorized finding

28

of fact when it concluded that the deed of trust allowed defendant to accept partial payments of amounts due under the note without waiving its right to demand full payment. According to plaintiff, the court's unauthorized fact finding at the demurrer stage violated his constitutional right to a jury trial and rendered the judgment of dismissal void.

Plaintiff's argument lacks merit. In rejecting plaintiff's accord and satisfaction theory as pleaded, the trial court did not engage in any factual finding; it made a legal conclusion in ruling on a demurrer based on documents attached to the complaint. Plaintiff had no right to a jury trial on such an issue of law and no constitutional violation occurred. We therefore affirm the order denying the motion.[20]

---

[20] In reaching our conclusion, we have not considered matters raised by plaintiff for the first time in his reply brief. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277–278.) For example, plaintiff contends that the "superior court's sixteen sua sponte continuances were unjustified and violated appellant's right to due process." (Emphasis omitted.)

29

## V.    DISPOSITION

The judgment of dismissal and order denying plaintiff's motion to vacate the judgement are affirmed.  Defendant Wells Fargo Bank, N.A. is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

BAKER, Acting P. J.

LEE, J.*

---

\*       Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30